## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TANIA NEMER,**[1] <br><br><br>                          *Plaintiff,* <br>    **v.** <br><br> **PAMELA BONDI,** <br> in her official capacity as <br> Attorney General <br> United States Department of Justice <br> 950 Pennsylvania Avenue, NW <br> Washington, D.C. 20530 <br><br> and <br><br> **UNITED STATES DEPARTMENT OF JUSTICE,** <br> 950 Pennsylvania Avenue, NW <br> Washington, D.C. 20530 <br><br>                          *Defendants.* | **No. 25-CV-___** |

## INTRODUCTION

1.     This is a case in which the President of the United States has asserted a constitutional right to discriminate against federal employees.

2.     In 1964, Congress passed the Civil Rights Act, which is one of the most consequential pieces of anti-discrimination legislation in American history.  Among other things, Title VII of the Civil Rights Act prohibits discrimination in employment based on race, color, religion, sex, or national origin.  In 1972, Congress extended Title VII's critical protections to the federal workforce.  Meanwhile, the Supreme Court has made it clear that the Constitution *itself* forbids the government from engaging in forms of discrimination—such as discrimination based

---

[1] Pursuant to Local Civil Rule 5.1(c)(1), the Plaintiff's residential address is being filed under seal with the Court in a separate Notice of Filing.

on a worker's partisan affiliation, which violates the First Amendment.  The result, today, is a professional federal civil service composed of Americans of every possible background and creed united in common service to the people of the United States.

3.      But in this case and others like it, the current Administration has taken direct aim at these foundational principles undergirding the federal civil service.  Indeed, in a formal administrative decision issued in this case, the government has concluded that Title VII's prohibition of discrimination in the federal workforce conflicts with the President's inherent Article II authority to oversee the executive branch.  This argument boils down to the remarkable legal theory that the President has a *constitutional right to discriminate against federal workers*, in violation of the law.  That is wrong.  Full stop.

4.      It bears emphasis: The government's legal theory reflects an unprecedented assault by the current Administration against the civil service laws that protect millions of federal employees.  If the government prevails in transforming the law, it will eviscerate the professional, non-partisan civil service as we know it.

5.      The Plaintiff in this case is Tania Nemer.  As described in more detail below, Ms. Nemer is the victim of unlawful discrimination in violation of Title VII and the First Amendment.  Ms. Nemer is female.  She is also a dual citizen of Lebanon, having been born to immigrant parents who moved to this country to pursue the American dream.  Before working for the federal government in 2023, Ms. Nemer ran for a judicial office in Ohio as a Democrat.

6.      Shortly after the new Administration took office in January, officials terminated Ms. Nemer because of her sex and national origin, in violation of Title VII, and because of her political activities and affiliation, in violation of the First Amendment.

7.      Here is what happened.  In 2023, Ms. Nemer began working as immigration judge within the Department of Justice's Executive Office for Immigration Review (EOIR).  She received the highest possible performance rating.  But on February 5, 2025—just fifteen days after the Administration assumed office on January 20, 2025—Ms. Nemer was abruptly fired while in her trial period.  The lightning-fast, precipitous timing indicates that the incoming Administration's decision was made—not as part of a careful evaluation of Ms. Nemer's qualifications or fitness for office—but instead as part of a rushed attempt by the new Administration to target disfavored civil servants.

8.      Far from explaining why she had been fired, Ms. Nemer's supervisor told her that she was one of his best employees.  Prior to being escorted out of the building, both Ms. Nemer's supervisor and the Acting Chief Immigration Judge of the United States claimed that they both did not know why she was being fired.  And to this day, the government has failed to offer any coherent and legitimate nondiscriminatory rationale for her termination, in writing or otherwise.  Instead, the government has simply said that "Ms. Nemer was removed from her position by the Acting Attorney General under the authority of Article II of the United States Constitution."

9.      On April 4, 2025, Ms. Nemer timely filed a formal discrimination complaint with the appropriate federal Equal Employment Opportunity (EEO) office.  According to federal regulations, the EEO office should have investigated and adjudicated her complaint.  But the EEO office did not follow the law, fully investigate the matter, and adjudicate her complaint.  Instead, on September 25, 2025, the EEO office issued a final agency decision that dismissed Ms. Nemer's complaint and asserted that Title VII does not constrain discriminatory dismissal against immigration judges because the statute purportedly conflicts with the Article II removal power.

10.     That is simply not true.  Under long-standing Supreme Court precedent, Congress has the authority to pass laws regulating the civil service.  Congress did precisely that when it made Title VII's protections applicable to the federal workforce.  Nothing in the Constitution gives the executive branch the right to discriminate.  Indeed, the government's constitutional theory would eviscerate civil rights protections for millions of federal employees.  If accepted, this theory would permit the government to fire federal workers based on race, sex, religion, national origin, or political affiliation with impunity. Such a result would fundamentally undermine the civil service system that has protected American democracy for over a century and return the federal workforce to the worst days of the patronage system.

11.     The stakes are extraordinary.  According to the final agency decision, the President may now fire female federal workers like Ms. Nemer—*because of their sex*—and the law would have nothing to say about it.  According to the final agency decision, the President can now fire federal workers born to immigrant parents with dual citizenship like Ms. Nemer—*because of their national origin*—and they would have no recourse.  And under the same logic, the President can fire federal workers like Ms. Nemer—*because of their political activities and affiliations*—and the courts would be powerless to act.

12.     This is not hypothetical.  It is what happened *in this case*.  Ms. Nemer was discriminated against because of her sex and national origin, in violation of Title VII, and she was discriminated against because she previously ran for office and prominently associated with a political party, in violation of the First Amendment.  The government's position is that Article II empowers the government to trample on Ms. Nemer's rights.  That unjust proposition is as wrong as it sounds.

4

13.     Because the government refused to rectify the discrimination—indeed, refused to fully investigate it—Ms. Nemer has nowhere else to turn but this Court.  Ms. Nemer respectfully requests this Court order complete relief—including a declaration that the government violated her rights; reinstatement; an order rescinding her termination; an award of frontpay and backpay; a writ of mandamus; and compensatory damages.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 5 U.S.C. § 2000e-5(f)(3).

15.     Venue is proper in this district under 5 U.S.C. § 2000e-5(f)(3) because the discriminatory removal was undertaken in the District of Columbia, and because employment records relevant to that discriminatory removal are maintained in the District of Columbia.

16.     Venue is proper in this district under 28 U.S.C § 1391 because Defendants reside in the District of Columbia and because a substantial part of the events occurred in the District of Columbia.

17.     Plaintiff has exhausted her administrative remedies prior to bringing this suit in that she timely filed a formal complaint of discrimination with the EEO office on April 4, 2025.  Less than ninety days have elapsed since the EEO office issued a final agency decision dismissing her complaint on September 25, 2025.

## PARTIES

18.     Plaintiff Tania Nemer was an immigration judge employed by the Department of Justice until her unlawful firing on February 5, 2025.

19.     Defendant Pamela Bondi is the Attorney General of the United States and the head of the Defendant United States Department of Justice.  She is sued in her official capacity.

## LEGAL BACKGROUND

20.     Because this is a case about the federal civil service, some legal background sets the stage.

21.     The Constitution assigns to Congress the authority to establish and regulate the federal civil service, including by enacting laws prohibiting abuse and discrimination in the workforce.  In *United States v. Perkins*, 116 U.S. 483 (1886), the Supreme Court rejected the argument that civil service laws are "an infringement upon the constitutional prerogative of the executive" to remove federal officers and employees, *id*. at 484.  The Court conclusively held that Article II's Appointments Clause provides Congress the constitutional authority to "limit and restrict the power of removal [over federal civil servants] as it deems best for the public interest." *Id* at 485.

22.     This rule flows from the plain text of the Constitution.   Pursuant to the Appointments Clause, "Congress may by law vest the Appointment of . . . inferior Officers, as they think proper, in the President alone . . . or in the Heads of Departments."  U.S. Const. Art. II, § 2.  That "constitutional authority" to "vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as congress may enact in relation to the officers so appointed." *Perkins*, 116 U.S. at 485.

23.     Since *United States v. Perkins*, the Supreme Court has consistently reaffirmed Congress's ability to enact rules that establish a professional federal workforce free from arbitrary removal and discrimination.  For example, even in *Myers v. United States* 272 U.S. 52 (1926), the historical highwater mark of the executive branch's removal power, the Court repeatedly confirmed "that Congress, in committing the appointment of inferior officers to the heads of

departments, may prescribe incidental regulations controlling and restricting the latter in the exercise of the power of removal." *Id.* at 161.

24.     This was not a glancing observation.  Over, over, and over again *Myers* reaffirmed that Congress may limit removal of inferior officers appointed by heads of departments.  *See also id*. at 127 (discussing *Perkins*); *id*. at 160 (same); *id*. at 162 (explaining that "the remedy for the evil of political executive removals of inferior offices is with Congress by a simple expedient" of vesting appointment in heads of departments); *id*. at 164 (explaining that "Congress is . . . given power to provide for appointments and removals of inferior officers after it has vested, and on condition that it does vest, their appointment in other authority than the President").  Indeed, the *Myers* Court went out of its way to approve the then-existing "Civil Service Law," and confirmed that if "appointments were vested in the heads of departments," "they could be entirely removed from politics."  *Id*. at 173-174.  From then until now, the Supreme Court has never meaningfully questioned Congress's ability to enact basic civil service laws.

25.     Relevant here, Congress has exercised its constitutional authority in several ways.  At the broadest level, the Civil Service Reform Act states that the government may undertake major disciplinary actions including terminations against a covered civil servant "only for such cause as will promote the efficiency of the service."  5 U.S.C. § 7513(a).  That law guarantees the civil servant 30 days' notice of the action, an opportunity to respond, and a written decision providing "specific reasons" for the action. *Id*. § 7513(b).  Covered civil servants can then appeal adverse actions to the U.S. Merit Systems Protection Board, an adjudicatory body that sits within the executive branch, and from there proceed to federal court.  To come within the protections of the Civil Service Reform Act, civil servants generally need to complete a probationary or trial period that is either 1 or 2 years long depending on the position in question.

26.    Civil servants within their trial period who fall outside the Civil Service Reform Act are still protected in other ways.  For example, the Constitution prohibits the government from firing a civil servant for an unconstitutional reason, such as in retaliation for the civil servant's protected speech or political activity.  *See Heffernan v. City of Paterson, New Jersey, et al.*, 578 U.S. 266, 268 (2016); *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 64 (1990); *Webster v. Doe*, 486 U.S. 592, 601 (1988).  In addition, a host of civil rights laws, including Title VII, broadly prohibit discrimination in employment in the federal government, including with respect to civil servants in their trial period.  *See* Rehabilitation Act, 29 U.S.C. § 791, *et seq.*; Age Discrimination in Employment Act, 29 U.S.C. § 612, *et seq.* Under Title VII, "personnel actions" within the executive branch "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a).

27.    If a civil servant believes she is the victim of unlawful discrimination in violation of Title VII, she may file a complaint with the appropriate EEO office, which then is required to investigate the matter within 180 calendar days from the date the formal complaint is filed. 29 C.F.R. § 1614.108.  The earlier of 180 calendar days from the filing of a formal complaint or the completion of the agency's investigation of the complaint, the civil servant may either (a) request a final decision from her agency on the merits of her complaint; (b) request a hearing before an administrative judge of the Equal Employment Opportunity Commission (EEOC); or (c) file suit in federal court. After either an agency final decision or decision by an EEOC administrative judge, the civil servant then may proceed directly to federal court or appeal to the EEOC.

## FACTUAL BACKGROUND

I. The Department Terminates Tania Nemer

28.    Plaintiff Tania Nemer was born to parents who had immigrated to America from Lebanon.  She is a dual citizen of Lebanon, a fact which was well-known to the Department.  From an early age, Ms. Nemer admired lawyers.  In 2006, she received her J.D. from Cooley Law School and embarked on a successful legal career in the Cleveland area, with a particular focus on representing clients in immigration matters.

29.    In 2019, Ms. Nemer unsuccessfully ran for a position as a judge for the Stow Municipal Court, on a ticket associated with the Democratic Party.  This fact was also well known within the Department.

30.    In 2023, Ms. Nemer applied for an open position as an immigration judge in EOIR's Cleveland Immigration Court.  The Department of Justice's memorandum recommending that she be hired described her as "the perfect candidate."  Ex. A.  The hiring memorandum highlighted Ms. Nemer's "12 years of experience practicing immigration law and representing noncitizens before EOIR."  The memorandum noted that Ms. Nemer had "also served as a magistrate judge" in the Akron Municipal Court, and it underscored "Ms. Nemer's experience managing a large docket and working in a high volume, high-pressure environment."

31.    Based on that glowing recommendation, Attorney General Merrick Garland appointed Ms. Nemer as an immigration judge on July 10, 2023.

32.    On February 5, 2025, Ms. Nemer was on the bench in the courtroom when the Assistant Chief Immigration Judge who was her immediate supervisor interrupted her and asked her to step outside.  The Assistant Chief Immigration Judge informed Ms. Nemer that she had been terminated, effective immediately. Ms. Nemer was escorted out of the building.

33.    On February 5, 2025, Ms. Nemer was one of three immigration judges in the Cleveland Immigration Court who were serving a probationary period.  The other two immigration judges—both of whom were male and were not of Lebanese origin—were not terminated on February 5, 2025.

34.    Ms. Nemer was also part of a class of 38 other immigration judges hired in July 2023.  Of that class, she was the only one of Lebanese origin and the only immigration judge with dual citizenship to an Arab country.  At the time of her termination in February, none of the other 37 non-Lebanese immigration judges had been terminated.

35.    When Ms. Nemer asked why she had been terminated, the Assistant Chief Immigration Judge who supervised Ms. Nemer said that he did not know.  According to the Assistant Chief Immigration Judge, Ms. Nemer was one of his best immigration judges.  Indeed, Ms. Nemer received the highest possible ratings on her last performance evaluation.

36.    At the time of Ms. Nemer's termination, Keith Hunsucker was the Acting Chief Immigration Judge.  Acting Chief Immigration Judge Hunsucker received the instruction to fire Ms. Nemer from Defendant Sirce Owen, the Acting Director of EOIR.  Ms. Nemer's Lebanese heritage and dual citizenship along with campaign for municipal judge were documented in her personnel file and background investigation materials accessible to Department decision-makers.  Similarly, her campaign for judicial office in 2019 was a matter of public record readily discoverable through basic internet searches of her name and was known within EOIR.  Upon information and belief, senior Department officials were aware of Ms. Nemer's protected characteristics and political background at the time termination decisions were made.

37.     Acting Chief Immigration Judge Hunsucker was also stationed at the EOIR Cleveland Immigration Court.  He had the office next door to Ms. Nemer, and the two interacted daily.

38.     On the day the Department terminated Ms. Nemer, Acting Chief Immigration Judge Hunsucker met with Ms. Nemer in person.  When Ms. Nemer asked Acting Chief Immigration Judge Hunsucker why she was being terminated, Mr. Hunsucker indicated that he did not know why Ms. Nemer was being terminated and became awkward and evasive.  It is particularly noteworthy that Mr. Hunsucker could not articulate a justification for the removal of a colleague, Ms. Nemer, whose office shared a wall with his office.

39.     At the time of her termination, Ms. Nemer received a brief termination letter signed by Sirce Owen, the then-Acting Director of EOIR.  Ex. B.  The letter did not provide any justification for her termination other than to state that "EOIR has determined that retaining you is not appropriate, and we thank you for your service."

40.     Ms. Nemer's performance as an immigration judge was always rated at the highest possible level.  At no point in the wake of her termination or during the administrative EEO process did the government claim that Ms. Nemer was fired because of misconduct or unacceptable performance—or for any other articulable non-discriminatory justification.

41.     Ms. Nemer has suffered significant harm because of Defendants' discriminatory actions, including loss of income, damage to her professional reputation in the legal community, emotional distress, and the derailment of her career.  The abrupt and public nature of her termination has made it difficult for her to obtain comparable employment and has caused ongoing reputational harm in the local Ohio legal community where she practiced for over a decade.

II. The EEO Complaint Process

11

42.    On February 24, 2025, Ms. Nemer contacted the EEO office, to initiate the federal sector EEO complaint process.  During EEO counseling, Ms. Nemer alleged in part that when the Department terminated her, the Department discriminated against her based on her sex (female) and national origin (Lebanon).

43.    The EEO office issued Ms. Nemer a notice of a right to file a formal EEO complaint on March 31, 2025.

44.    On April 4, 2025, pursuant to 29 C.F.R. § 1614.106, Ms. Nemer filed a formal complaint of discrimination with the EEO office.

45.    On May 21, 2025, the EEO office started an investigation into Ms. Nemer's EEO complaint.

46.    During the EEO investigation, EOIR repeatedly failed to produce materials that would shed light on its reasons for terminating Ms. Nemer.  Historically, before an immigration judge is terminated, a memorandum is provided to a senior Department of Justice official regarding the termination and articulating the justification for that action. In other cases, the government has disclosed such memoranda during administrative proceedings.  But in this case, the government has failed to provide a memorandum regarding Ms. Nemer's termination.

47.    Instead, during the investigation, EOIR submitted affidavits from Acting Chief Immigration Judge Hunsucker and EOIR Acting Director Sirce Owen.  *See* Exs. C, D.

48.    In his affidavit, Acting Chief Immigration Judge Hunsucker maintained that—despite being instructed to terminate Ms. Nemer by Ms. Owen—he did not know the reason for her termination.

49.    In her affidavit, Ms. Owen also did not articulate the justification for Ms. Nemer's termination.  Instead, she submitted a vague and evasive narrative that raised more questions than it answered.

50.    Ms. Owen supplied the affidavit in response to a request from the EEO investigator. The investigator directed Ms. Owen to respond to discrete questions in a form that probed the alleged justification for Ms. Nemer's termination.  Among other things, the form asked Ms. Owen to: (i) articulate "management's reason for terminating" Ms. Nemer; (ii) detail whether Ms. Owen conferred "with anyone" regarding Ms. Nemer's termination; and (iii) answer whether "any other management official" was involved in Ms. Nemer's termination.

51.    Ms. Owen did not respond to these and other specific questions on the form.   She instead wrote "see attached response."  Meanwhile, the "attached response" did not answer the investigator's questions.  Rather, Ms. Owen wrote that "Ms. Nemer was removed from her position by the Acting Attorney General under the authority of Article II of the United States Constitution."

52.    Because the Acting Attorney General led the Department of Justice from his office in the District of Columbia, this removal was ordered from the District of Columbia.

53.    In two paragraphs at the conclusion of her affidavit, Ms. Owen noted two local tax cases involving Ms. Nemer filed in Lakewood Ohio Municipal Court in 2010 and 2011; noted an Ohio state tax lien from 2021; and asserted Ms. Nemer had "a history of driving offenses" in the late 1990s and early 2000s.

54.    Notably, at no point did Ms. Owen assert that Acting Attorney General terminated Ms. Nemer *because of those alleged tax mistakes and driving infractions*, nor even that those matters were a consideration in her termination—to the point of being deliberately misleading and evasive.  The attachment to Ms. Owen's affidavit indicates that she deliberately avoided asserting

any causal connection between these stale (and previously reported) infractions and Ms. Nemer's termination because Ms. Owen knew *the connection did not exist* and that inventing one under oath could expose her to legal consequences. Ms. Owen nonetheless willfully created the misleading impression that the prior infractions were somehow connected to Ms. Nemer's termination by mentioning them in sequence, intending that the reader would fill in the gaps and assume the Department had terminated Ms. Nemer on that basis. In this manner, Owen deliberately structured her response to create a false impression of a justification while avoiding direct misstatements under oath. This calculated evasiveness demonstrates that Owen knew the real reasons for Ms. Nemer's termination were discriminatory and unlawful.[2]

55.     Nor could the offenses have provided a reason to terminate Ms. Nemer. The alleged driving offenses were two decades old at the time of Ms. Nemer's termination. EOIR was well aware of Ms. Nemer's driving infractions *before* she was hired as an immigration judge in 2023 because it conducted a background check. These stale infractions could not justify Ms. Nemer's abrupt termination in February 2025. To the extent they played any role at all, they were a post-hoc pretext for unlawful discrimination.

56.     Similarly, because the agency conducted a background check *before* hiring Ms. Nemer, the agency was aware of the cases in Lakewood Ohio Municipal Court from 2010 and 2011—which were a decade-and-a-half old at the time of her termination. In the background investigation, Ms. Nemer had provided copies of the dockets for the cases. The agency therefore knew that those cases were quickly resolved after Ms. Nemer paid the (very small) amounts at

---

[2] Indeed, the EEO counselor was misled by these or similar statements. The EEO counselor's report suggested that Ms. "Owen stated that Ms. Nemer's employment was terminated on February 5, 2025, due to information that was discovered in background investigation." But Ms. Owen's affidavit notably did *not* articulate that basis for firing Ms. Nemer.

issue.  These stale infractions could also not justify Ms. Nemer's abrupt termination in February 2025.  To the extent they played any role at all, they too were a post-hoc pretext for unlawful discrimination.

57.    Finally, in 2024, EOIR contacted Ms. Nemer about the 2021 tax lien, which was for a little over $560.  Prior to being contacted by EOIR about the lien, Ms. Nemer was completely unaware of it, because she never received written notice regarding the lien.  Ms. Nemer spent over two weeks trying to determine the source of the lien.  It turned out that the lien was the result of a penalty fee Ohio imposed when her payroll company had improperly processed ***documentation*** for Ms. Nemer's nanny.  To be very clear: The fee was ***not*** for a failure to pay taxes.  Ms. Nemer immediately paid the small fee and worked to release the lien.  This inadvertent administrative mistake could also not justify Ms. Nemer's abrupt termination in February 2025.  To the extent it played any role at all, it was a post-hoc pretext for unlawful discrimination.

58.    In short, none of these supposed infractions would warrant termination.  At best, they represent an effort by the Defendants to manufacture a justification, after the fact, for the agency's unlawful and discriminatory actions.

59.    The Department's EEO office did not complete the investigation as it was required to by EEOC regulations.   Instead, on September 25, 2025, the Department's EEO office issued a final agency decision dismissing her complaint.  Ex.  E.

60.    According to the final agency decision, "the Department advised EOIR that" "EEO laws do not supersede Article II of the Constitution."  The final agency decision then stated that Ms. Nemer's termination

> was a lawful exercise of the Attorney General's authority under Article II of the Constitution.   Article II of the Constitution allows the President and heads of departments exercising his power to remove inferior officers without cause, subject

to only narrow exceptions that do not apply to your former position.  No statute provides otherwise, and even if it did, the statute would run afoul of Article II.[3]

61.    In short, the Department of Justice has now declared Title VII in conflict with Article II.  This is a breathtaking assault on a landmark federal statute.

### III. The Implications of the Department's Position

62.    The Department of Justice is simply wrong on the law.  Under *United States v. Perkins* and its progeny, Congress may regulate the removal of inferior officers and employees within the federal government.  Congress exercised that power when it extended Title VII's protections to the federal workforce.  This Court should not permit the Department of Justice to unilaterally rewrite constitutional law.

63.    It bears emphasizing what is at stake.  Under the government's view, the President has a constitutional right to discriminate against federal workers on the basis of their race, sex, and national origin—and Congress and the Courts are powerless to Act.  Meanwhile, under the same logic, the President can remove federal workers because they belong to another political party or previously ran for office—and the Court cannot do anything about it.

64.    The government's constitutional theory would effectively nullify civil rights protections for millions of federal employees. If accepted, this precedent would permit the President to terminate federal workers based on race, sex, religion, national origin, age, or disability with complete impunity.  The theory would also eviscerate First Amendment protections against political discrimination, allowing wholesale partisan purges of the federal workforce. This

---

[3] In a brief paragraph, the decision also stated that the complaint was alternatively dismissed because Ms. Nemer had mistakenly filed an MSPB appeal prior to filing her EEO complaint.  But Ms. Nemer did not have MSPB rights, she filed the appeal in error, and she withdrew the MSPB appeal when she realized her mistake.  As a matter of law, that mistaken MSPB appeal did not deprive her of the right to file an EEO complaint.  Ms. Nemer separately filed a complaint with the Office of Special Counsel, which closed out the complaint on April 21, 2025.

interpretation of Article II finds no support in constitutional text, history, or Supreme Court precedent.

65.    This Court can and should conclusively reject these deeply unjust propositions and provide Ms. Nemer fulsome relief for the discrimination she suffered.

**CLAIM FOR RELIEF**

**COUNT ONE**
**VIOLATION OF TITLE VII – DISCRIMINATION BASED ON SEX – FEMALE**

66.    The preceding paragraphs are incorporated and realleged here.

67.    Ms. Nemer was terminated because of her sex (female), in violation of Title VII.

68.    Ms. Nemer was one of three immigration judges in their trial periods in the Cleveland Immigration Court, the other two of whom were men and had substantially the same roles and responsibilities as Ms. Nemer.

69.    On February 5, 2025, Ms. Nemer was fired by the Acting Attorney General—but her two male colleagues were not.

70.    Defendants have never provided a non-pretextual justification for this targeted removal of the only female probationary judge in the Cleveland Immigration Court.

71.    On October 24, 2025, EOIR announced that it had hired 11 new permanent immigration judges.  All of them are male.

72.    Ms. Nemer fully exhausted her claims in the EEO process and is entitled to bring this action in this Court.

**COUNT TWO**
**VIOLATION OF TITLE VII – DISCRIMINATION BASED ON NATIONAL ORIGIN – LEBANESE**

73.    The preceding paragraphs are incorporated and realleged here.

74.    Ms. Nemer was terminated because of her national origin (Lebanese), in violation of Title VII.

75.    The other two immigration judges in their probationary periods in the Cleveland Immigration Court were not of Lebanese national origin, and were not remove on February 5, 2025.

76.    Ms. Nemer was one of 38 immigration judges hired as part of the same class, who were similarly situated to Ms. Nemer.  To Ms. Nemer's knowledge, she is the only member of the class who is of Lebanese national origin—and, indeed, the only one who is a dual citizen and prominently known to be of Arab origin.

77.    On February 5, 2025, Ms. Nemer was the only member of her class who was removed by the Acting Attorney General.

78.    Defendants have never provided a non-pretextual justification for this targeted removal of the only Lebanese—indeed, the only prominent Arab—probationary judge in the class.

79.    Ms. Nemer fully exhausted her claims in the EEO process and is entitled to bring this action in this Court.

## COUNT THREE
## VIOLATION OF THE FIRST AMENDMENT

80.    The preceding paragraphs are incorporated and realleged here.

81.    Ms. Nemer was terminated because of her political activity and her partisan affiliation in violation of the First Amendment.

82.    The fact of Ms. Nemer's political affiliation and partisan activity was well-known throughout EOIR.  A Google search for her name easily reveals she is affiliated with the Democratic Party.  At one point, Acting Chief Immigration Judge Hunsucker specifically mentioned to Ms. Nemer that he lived in the same city as Ms. Nemer, which she understood to be

because Mr. Hunsucker had seen her campaign signs in his hometown, demonstrating that senior EOIR officials were aware of her Democratic political activities. Another immigration judge had similarly spoken to Ms. Nemer about her campaign for office—reflecting the fact that her campaign was well known. On information and belief, senior officials at the Department of Justice, including the then-Acting Attorney General, either knew about or learned about Ms. Nemer's political affiliation and partisan activity.

83. Defendants have never provided a non-pretextual justification for their targeted removal of an immigration judge who prominently engaged in political activity and had a well-known partisan affiliation.

84. Instead, the Department singled out Ms. Nemer because of her well-known political activity and partisan affiliation. This violates the First Amendment.

**COUNT FOUR**
**DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201 AND 2202**

85. The preceding paragraphs are incorporated and realleged here.

86. Ms. Nemer is entitled to declaratory relief on the basis of all claims identified. There is a substantial ongoing controversy between Ms. Nemer and the Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that Defendants did not have authority to remove Ms. Nemer on the basis of her national origin, sex, protected Title VII activity, political activity, and partisan affiliation.

**COUNT FIVE**
**WRIT OF MANDAMUS**
**(Against All Defendants)**

87. In the alternative, Ms. Nemer is entitled to a writ of mandamus or relief in the nature of mandamus commanding Defendants to return her to her office.

88.     Title VII and the First Amendment impose a ministerial duty on all Defendants not to discriminate on the basis of sex, national origin, political activity or partisan affiliation.  Ms. Nemer is entitled to a writ of mandamus returning her to her office. Absent this Court granting one of the counts identified above, there is no other adequate means of redress.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all questions of fact raised by this Complaint.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this court:

A.  Declare that Defendants' actions violated Plaintiff's rights under Title VII to be free from unlawful discrimination and retaliation, and Plaintiff's rights under the First Amendment;

B.  Reinstate Plaintiff to her previous position;

C.  Award Plaintiff full back pay and benefits and interest;

D.  Award Plaintiff front pay;

E.  Award compensatory damages for emotional pain, suffering inconvenience, mental anguish, personal indignity, and other pecuniary and non-pecuniary losses in an amount to be determined by the jury by trial in excess of $10,000;

F.  Order Defendants to rescind the discriminatory termination of Plaintiff;

G.  Issue injunctive relief returning Plaintiff to her position;

H.  Award Plaintiff full and reasonable attorney's fees and costs for this action;

I.  Award Plaintiff pre- and post-judgment interest as may be permitted by law;

J.  Issue a writ of mandamus; and

K.  Award any other such relief that this Court deems appropriate.

Respectfully submitted,

/s/ James M. Eisenmann
JAMES M. EISENMANN
  (D.C. Bar No. 435456)
ALDEN LAW GROUP, PLLC
1850 M Street, NW, Suite 901
Washington, DC 20036
202-463-0300
jeisenmann@aldenlg.com

/s/ Nathaniel A.G. Zelinsky
NATHANIEL A.G. ZELINSKY*
  (D.C. Bar No. 1724093)
MARY L. DOHRMANN**
KYLE R. FREENY
  (D.C. Bar No. 247857)
JAMES I. PEARCE***
SAMANTHA P. BATEMAN*
  (D.C. Bar No. 492919)
WASHINGTON LITIGATION GROUP
1717 K Street, NW, Suite 1120
Washington, D.C. 20006
202-521-8750
nzelinsky@washingtonlitigationgroup.org

*Pro Hac Vice application forthcoming

** Admitted only in New York; practicing
under the supervision of D.C. bar members

 *** Admitted only in New York and North
Carolina; practicing under the supervision of
D.C. bar members


Attorneys for Plaintiff Tania Nemer