UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TANIA NEMER,<br><br>    Plaintiff,<br><br>  v.<br><br>TODD BLANCHE,<br>Acting Attorney General, *et al.*,[1]<br><br>    Defendants. | No. 25-cv-4170 (SLS) |

**PLAINTIFF'S OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS COMPLAINT**

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Todd Blanche is automatically substituted as defendant for Pamela J. Bondi.

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES.........................................................................................ii

INTRODUCTION ........................................................................................................1

BACKGROUND ..........................................................................................................3

LEGAL STANDARD...................................................................................................6

ARGUMENT................................................................................................................7

    I.    COUNTS ONE AND TWO ALLEGE VALID TITLE VII CLAIMS.......................7

        A.    Applicable Law ...........................................................................................7

        B.    Nemer has adequately alleged Title VII violations. ...............................9

        C.    Nemer exhausted the relevant administrative process. .......................16

    II.    COUNT THREE ALLEGES A VALID FIRST AMENDMENT CLAIM................19

        A.    Applicable Law .........................................................................................19

        B.    Nemer has adequately alleged a First Amendment claim. ..................21

    III.    ARTICLE II DOES NOT GRANT THE FEDERAL GOVERNMENT AUTHORITY TO VIOLATE TITLE VII OR THE FIRST AMENDMENT. ..................................25

        A.    Article II does not grant the President unfettered authority to remove inferior officers. ..........................................................................................25

        B.    Article II does not authorize federal officials to violate immigration judges' rights under Title VII and the First Amendment. ..........................................29

    IV.    NEMER APPROPRIATELY REQUESTED DECLARATORY RELIEF AND MANDAMUS...................................................................................................36

CONCLUSION...........................................................................................................38

# TABLE OF AUTHORITIES

**Cases**

*A.A. v. Att'y Gen. of the U.S.*,
973 F.3d 171 (3d Cir. 2020) ................................................................................... 33

*Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*,
495 F.3d 695 (D.C. Cir. 2007)................................................................................. 21

*Al-Saffy v. Vilsack*,
827 F.3d 85 (D.C. Cir. 2016)................................................................................... 16

*Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*,
830 F.3d 667 (D.C. Cir. 2016)................................................................................. 24

*Ames v. Ohio Dep't of Youth Servs.*,
605 U.S. 303 (2025).................................................................................................. 9

*Artis v. Bernanke*,
630 F.3d 1031 (D.C. Cir. 2011) .............................................................................. 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................................. 7

*Bain v. Office of Att'y Gen.*,
648 F. Supp. 3d 19 (D.D.C. 2022) .......................................................................... 35

*Baloch v. Kempthorne*,
550 F.3d 1191 (D.C. Cir. 2008)................................................................................ 8

*BEG Invs., LLC v. Alberti*,
144 F. Supp. 3d 16 (D.D.C. 2015) .......................................................................... 22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................................. 6, 7

*Black Lives Matter D.C. v. Trump*,
544 F. Supp. 3d 15 (D.D.C. 2021) .......................................................................... 23

*Brady v. Off. of Sergeant at Arms*,
520 F.3d 490 (D.C. Cir. 2008)....................................................................... 8, 12, 13

*Branti v. Finkel*,
445 U.S. 507 (1980)................................................................... 20, 24, 25, 30

*Brown v. Gen. Servs. Admin.*,
425 U.S. 820 (1976)................................................................................................ 32

*Browning v. Clinton*,
292 F.3d 235 (D.C. Cir. 2002)................................................................................... 6

*Buchanan v. Barr,*
    71 F.4th 1003 (D.C. Cir. 2023) ................................................................ 23

*Burley v. National Passenger Rail Corp.,*
    801 F.3d 290 (D.C. Cir. 2015) ................................................................. 13

*Cannon v. District of Columbia,*
    717 F.3d 200 (D.C. Cir. 2013) ................................................................. 10

*Castleberry v. STI Group,*
    863 F.3d 259 (3d Cir. 2017) ...................................................................... 9

*Citizens for Resp. & Ethics in Wash. v. Exec. Off. of the President,*
    587 F. Supp. 2d 48 (D.D.C. 2008) ........................................................... 37

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
    603 U.S. 799 (2024) ................................................................................. 18

*Elrod v. Burns,*
    427 U.S. 347 (1976) .......................................................................... 20, 36

*Escobar Molina v. U.S. Dept. of Homeland Security,*
    811 F. Supp. 3d 1 (D.D.C. 2025) ............................................................. 10

*Figeroa v. Pompeo,*
    923 F.3d 1078 (D.C. Cir. 2019) ............................................................... 12

*Fleming v. U.S. Dep't of Agric.,*
    987 F.3d 1093 (D.C. Cir. 2021) ............................................................... 26

*Frazier v. MSPB,*
    672 F.2d 150 (D.C. Cir. 1982) ................................................................. 32

*Free Enterprise Fund v. PCAOB,*
    561 U.S. 477 (2010) ..................................................................... 27, 28, 31

*Garcia v. Garland,*
    64 F.4th 62 (2d Cir. 2023) ....................................................................... 33

*George v. Leavitt,*
    407 F.3d 405 (D.C. Cir. 2005) ........................................................ 9, 10, 13

*Harris v. Attorney General of U.S.,*
    657 F. Supp. 2d 1 (D.D.C. 2009) ....................................................... 18, 19

*Harris v. Bessent,* 775 F. Supp. 3d 164 (D.D.C. 2025),
    *rev'd on other grounds,* 160 F.4th 1235 (D.C. Cir.),
    *petition for cert. filed,* No. 25-1110 (U.S. Mar. 17, 2026) ....................... 37

*Hettinga v. United States,*
    677 F.3d 471 (D.C. Cir. 2012) ................................................................... 7

*Ho v. Garland*,
106 F.4th 47 (D.C. Cir. 2024) ..................................................................... 12

*Holmes v. Austin*,
No. 23-2415, 2024 WL 4345829 (D.D.C. Sep. 30, 2024) ....................................... 16

*Horne v. MSPB*,
684 F.2d 155 (D.C. Cir. 1982)...................................................................... 24

*Int'l Brotherhood of Teamsters v. United States*,
431 U.S. 324 (1977)................................................................................. 10

*Jackler v. DOJ*,
2026 M.S.P.B. 3, 2026 WL 789485 (Mar. 20, 2026) ............................................ 31

*Jackler v. DOJ*,
No. 26-1575 (Fed. Cir.) ............................................................................. 31

*James v. U.S. Dept. of Health & Human Servs.*,
824 F.2d 1132 (D.C. Cir. 1987)................................................................ 18, 19

*Jimenez Fuentes v. Torres Gaztambide*,
807 F.2d 236 (1st Cir. 1986) ....................................................................... 20

*Joyner v. Morrison & Foerster LLP*,
140 F.4th 523 (D.C. Cir. 2025)............................................................ 14, 15, 16

*Kennedy v. Braidwood Mgmt., Inc.*,
606 U.S. 748 (2025)................................................................. 26, 29, 33, 35

*Kirwa v. Dep't of Defense,*
285 F. Supp. 3d 257 (D.D.C. 2018) ................................................................ 37

*Lewis v. U.S. Parole Comm'n*,
743 F. Supp. 3d 181 (2024).......................................................................... 37

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973).................................................................................. 8

*McNair v. District of Columbia*,
213 F. Supp. 3d 81 (D.D.C. 2016) ................................................................. 14

*Media Matters for Am. v. FTC*,
805 F. Supp. 3d 105 (D.D.C. 2025) ................................................................ 22

* *Morrison v. Olson*,
487 U.S. 654 (1988)............................................................... 2, 26, 27, 30

* *Myers v. United States*,
272 U.S. 52 (1926)............................................................................ 2, 27

*Nanko Shipping, USA v. Alcoa, Inc.*,
    850 F.3d 461 (D.C. Cir. 2017).......................................................................... 9, 13, 14

*Nelson v. Blinken*,
    No. 18-1880, 2023 WL 7156516 (D.D.C. Oct. 31, 2023) ....................................... 19

*O'Hare Truck Serv., Inc. v. City of Northlake*,
    518 U.S. 712 (1996)......................................................................................... 2, 20

*Payne v. Dep't of Youth Rehab. Servs.*,
    No. 18-562, 2019 WL 804898 (D.D.C. Feb. 21, 2019) ............................................11

*Pickering v. Board of Education*,
    391 U.S. 563 (1968)......................................................................................... 23, 25

*Rivera v. U.S. Att'y Gen.*,
    No. 23-cv-2113, 2025 WL 2676436 (M.D. Fla. Sep. 18, 2025) ........................... 35

*Roy v. MSPB*,
    672 F.3d 1378 (Fed. Cir. 2012) ............................................................................. 17

*Rutan v. Republican Party of Ill.*,
    497 U.S. 62 (1990)................................................................................................. 20

*Salazar v. Washington Met. Transit Auth.*,
    401 F.3d 504 (D.C. Cir. 2005)............................................................................... 12

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020)............................................................................................... 27

*Severino v. Biden*,
    71 F.4th 1038 (D.C. Cir. 2023) ............................................................................. 37

*Singletary v. District of Columbia*,
    351 F.3d 519 (D.C. Cir. 2003)................................................................................. 8

*Swierkiewicz v. Sorema N. A.*,
    534 U.S. 506 (2002).................................................................................................. 8

*Townsend v. United States*,
    236 F. Supp. 3d 280 (D.D.C. 2017) .................................................................... 8, 9

* *United States v. Arthrex, Inc.*,
    594 U.S. 1 (2021)...........................................................................................passim

* *United States v. Perkins*,
    116 U.S. 483 (1886).................................................................................... 2, 25, 26

*W. Virginia State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943)............................................................................................... 20

*Webster v. Doe*,
  486 U.S. 592 (1988) ........................................................................................................ 2

*Williams v. District of Columbia*,
  317 F. Supp. 3d 195 (D.D.C. 2018) .............................................................................. 21

*Wilson v. Arkansas Dept. of Human Services*,
  850 F.3d 368 (8th Cir. 2017) ........................................................................................ 12

*Winston v. Clough*,
  712 F. Supp. 2d 1 (D.D.C. 2010) .................................................................................... 8

*Young v. Dillon Cos., Inc.*,
  468 F.3d 1243 (10th Cir. 2006) .................................................................................... 12

**Statutes**

5 U.S.C. § 105 ................................................................................................................ 35
5 U.S.C. § 7511 ......................................................................................................... 5, 17
5 U.S.C. § 7513 .................................................................................................. 5, 17, 28
5 U.S.C. § 7701(a) ......................................................................................................... 17
5 U.S.C. § 7511(a)(1)(C)(ii) ........................................................................................... 5
8 U.S.C. § 1101(b)(4) ............................................................................................. passim
8 U.S.C. § 1103(g)(2) ....................................................................................... 30, 33, 34
28 U.S.C. § 503 .............................................................................................................. 29
42 U.S.C. § 2000e ............................................................................................................ 5
42 U.S.C. § 2000e-2(a)(1) ............................................................................................... 7
42 U.S.C. § 2000e-16 ................................................................................... 8, 16, 29, 35

**Regulations**

5 C.F.R. § 752.401(c)(5) ................................................................................................ 17
8 C.F.R. § 1003.1 .............................................................................................. 30, 33, 34
8 C.F.R. § 1003.10 ............................................................................................ 32, 33, 34
8 C.F.R. § 1208.2 ........................................................................................................... 34
8 C.F.R. § 1208.30(g)(2)(iv) .......................................................................................... 34
29 C.F.R. § 1614.105(a)(1) ............................................................................................ 16
29 C.F.R. § 1614.106(b) ................................................................................................. 16
29 C.F.R. § 1614.107(a)(4) ............................................................................................ 17
29 C.F.R. § 1614.302 ......................................................................................... 17, 18, 19

**Constitutional Provisions**

U.S. Const. art. II, § 2, cl. 2 .......................................................................................... 25

**Other Authorities**

*In re Guzman-Arguera*, 22 I. & N. Dec. 722 (BIA 1999) ............................................................... 34

*In re J.F.F.*, 23 I. & N. Dec. 912 (A.G. 2006) ....................................................................... 30, 33

Sirce E. Owen, Acting Director, Executive Office of Immigration Review,
U.S. Dep't of Justice, Neutrality and Impartiality in Immigration Court
Proceedings (June 27, 2025) .................................................................................... 24

U.S. Dep't of Justice EOIR, Press Release, *EOIR Announces 15 Immigration
Judges and 17 Temporary Immigration Judges* (Apr. 8, 2026) ................................................ 10

**INTRODUCTION**

According to the federal government, the President has a constitutional right to discriminate against federal workers—here, based on sex, national origin, and political affiliation—and Congress and the courts are powerless to stop that abuse. That breathtaking proposition is as wrong as it sounds. The Court should reject the government's invitation to remake more than a century of precedent, deny the motion to dismiss, and allow this case to proceed to discovery.

Plaintiff Tania Nemer pleaded hornbook discrimination claims under Title VII of the Civil Rights Act of 1964 and a straightforward First Amendment violation. Nemer is a woman, of Lebanese origin, and prominently associated with the Democratic Party because she ran for a local office in Ohio. In 2023, the federal government hired Nemer as an immigration judge because she was "the perfect candidate" for the job. Nemer lived up to expectations and received the highest possible job performance ratings.

But immediately after the current administration entered office, the federal government abruptly fired Nemer without any warning. When Nemer asked why she was being terminated, neither her immediate supervisor nor the then-Acting Chief Immigration Judge could provide any explanation. To this day, Defendants—the Department of Justice and the Acting Attorney General—cannot articulate a coherent reason for their actions. The closest Defendants have come is an opaque reference to years-old driving infractions and minor mistakes with Nemer's state taxes—something about which Defendants have long known and has never been a source of concern. This all smacks of pretext and strongly indicates that Defendants targeted Nemer for improper and unlawful reasons. Meanwhile, when the government terminated Nemer, it did not fire two male immigration judges in her office who were not of Lebanese origin and who—like

1

Nemer—were still serving in their trial period. And the government subsequently hired male immigration judges to replace her.

The government raises a series of throwaway threshold arguments about the sufficiency of the Complaint. But Defendants' heart is not in it. For good reason. The Complaint more than adequately alleges both Title VII and First Amendment claims. Instead, the government's primary defense for its actions boils down to the remarkable proposition that the President and senior government officials have unfettered Article II authority to fire whomever they want, whenever they want, for whatever reason. This is the first Title VII case to reach the motion-to-dismiss stage in which the government advances this bizarre theory. But it will by no means be the last. In case after case, the government is now repeatedly embracing a sweeping assertion of Article II removal authority, claiming an absolute right to discriminate against and abuse millions of federal workers.

The government is dead wrong on the law. Under longstanding Supreme Court precedent, when Congress vests the appointment of inferior officers in the heads of agencies—as it has done for immigration judges like Tania Nemer—Congress "may limit and restrict the power of removal as it deems best for the public interest." *United States v. Perkins*, 116 U.S. 483, 485 (1886); *see also, e.g.*, *Morrison v. Olson*, 487 U.S. 654, 689 n.27 (1988); *Myers v. United States*, 272 U.S. 52 (1926) (Taft, C.J.). Congress did just that when it enacted Title VII and prohibited the government from engaging in discrimination based on sex and national origin. In addition, federal workers possess constitutional rights, *see Webster v. Doe*, 486 U.S. 592, 602-05 (1988), including the First Amendment right to be free from partisan discrimination (except in narrow circumstances not present here), *see O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996). This First Amendment right to be free from partisan discrimination no more conflicts with Article II than Title VII does—namely not at all.

2

Make no mistake: Accepting Defendants' sweeping constitutional arguments in this case would spell the end for the professional, non-partisan civil service. There is no way to rule for the government without overturning *Perkins* and its progeny. If the government is right about the law, it will be able to fire millions of federal workers for any reason or no reason at all. Or worse, for a blatantly discriminatory reason. The Court should reject that profoundly unjust result and deny the motion to dismiss.

## BACKGROUND

**A.** In July 2023, Defendants hired Tania Nemer to work as an immigration judge in the Executive Office for Immigration Review ("EOIR") of the Department of Justice ("Department" or the "agency"). Compl. ¶¶ 30-31, ECF No. 1. According to the memorandum that recommended Nemer's hiring, she was "the perfect candidate." *Id*. ¶ 30 (quoting ECF No. 1-4, at 2). Nemer had "12 years of experience practicing immigration law and representing noncitizens before EOIR," previously worked as a magistrate judge in a municipal court, and had "experience managing a large docket and working in a high volume, high-pressure environment." *Id*. (quoting ECF No. 1-4, at 2). Nemer lived up to expectations while serving on the Cleveland Immigration Court. For the entire time that she worked for EOIR, Nemer's job performance was rated at the highest possible level. *Id*. ¶¶ 35, 40.

Nemer is female and is a dual citizen of Lebanon. Both facts were documented in her EOIR personnel file. *Id*. ¶¶ 28, 36. She also is affiliated with the Democratic Party. In 2019, Nemer ran to become a judge on the Stow Municipal Court on a ticket associated with the Democratic Party. *Id.* ¶ 29. Her campaign was documented in her personnel file, was a fact in the public record, and was readily discoverable through a basic internet search. *Id*. ¶¶ 36, 82. At one point, then-Acting Chief Immigration Judge Keith Hunsucker mentioned to Nemer that they lived in the same city, and she understood that he knew that fact because he had seen her campaign signs.

3

*Id*. ¶ 82. Another immigration judge had spoken with Nemer about her campaign for office, underscoring the fact that her campaign was known by her colleagues. *Id.*

On February 5, 2025, just fifteen days after the new administration assumed office, Defendants abruptly fired Nemer. "Nemer was on the bench in the courtroom when" "her immediate supervisor," who was also an immigration judge, "interrupted her and asked her to step outside." *Id*. ¶ 32. That immigration judge then told Nemer "that she had been terminated, effective immediately," and she "was escorted out of the building." *Id*.

To this day, no one has provided Nemer with a coherent, nondiscriminatory reason for her termination. *Id*. ¶ 8. At the time she was fired, Nemer received a boilerplate termination letter stating that EOIR "determined that retaining [her was] not appropriate." *Id*. ¶ 39 (quoting ECF No. 1-5, at 1). On the day of her firing, Nemer asked her supervisor "why she had been terminated." *Id*. ¶ 35. He "said that he did not know," and confirmed that she "was one of his best immigration judges." *Id*. Nemer also asked Acting Chief Immigration Judge Hunsucker the reason for her termination. Hunsucker "indicated that he did not know" "and became awkward and evasive." *Id*. ¶ 38. It was particularly notable that Hunsucker could not say why Nemer had been fired because he had been instructed to terminate Nemer by Sirce Owen, then the Acting Director of EOIR. *Id.* ¶ 36.

At the time of her abrupt termination, Nemer was in a two-year trial period.[2] *Id*. ¶ 7. Two other immigration judges on the Cleveland Immigration Court—both of whom are male and are

---

[2] Nemer was appointed to a so-called two-year "not-to-exceed" appointment, which means she was "subject to a two-year trial period." ECF No. 1-5. At the end of that trial period, EOIR typically converts those positions into permanent employment, but EOIR is not required to do so. In addition, because she had not served for two years, Nemer also lacked substantive and procedural rights under the Civil Service Reform Act. Nemer was a member of the "excepted service" who was not "preference eligible," and was not entitled to general civil service rights until she had "completed 2 years of current continuous service" under "other than a temporary

not of Lebanese origin—were also serving a two-year trial period when Nemer was discharged, but those two judges were not fired alongside Nemer. *Id.* ¶ 33. Nemer was hired in July 2023 as part of a class of 38 immigration judges, and yet none of the 37 others—who were not of Lebanese origin and lacked dual citizenship with an Arab country—was fired alongside Nemer. *Id.* ¶ 34.

**B.**    In February 2025, Nemer contacted the Equal Employment Opportunity ("EEO") office at her agency to initiate the federal-sector EEO complaint process. *Id.* ¶ 42. Around the same time, Nemer also mistakenly filed an appeal with the Merit Systems Protection Board ("MSPB"). *Id.* ¶ 60 n.3. When Nemer realized that she did not have MSPB rights because she had served in her position for less than two years and thus was not an "employee" as defined in 5 U.S.C. § 7511(a)(1), she withdrew that appeal. Compl. ¶ 60 n.3. Nemer subsequently filed a formal discrimination complaint with the EEO office alleging that she was removed based on her sex (female) and national origin (Lebanese) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Compl. ¶¶ 42, 44; ECF No. 1-8, at 1.

Initially, the Department of Justice EEO office seemed to process Nemer's discrimination complaint as it would have in the normal course. During the administrative proceedings, an EEO investigator asked then-Acting Director Owen to explain why Nemer was fired. Owen did not respond to the specific questions posed by the investigator, and instead submitted "a vague and evasive narrative that raised more questions than it answered." Compl. ¶¶ 49-51. In particular, Owen noted that Nemer had been involved in "two local tax cases," noted the existence of an

---

appointment limited to 2 years or less." 5 U.S.C. §§ 7511(a)(1)(C)(ii), 7513(a), (b), (d); *see also, e.g.,* ECF No. 1-4, at 3. Note also that even preference eligible veterans who need to serve only one year to receive protections under the Civil Service Reform Act are still subject to a separate two-year trial period if hired into a two-year "not-to-exceed" appointment.

"Ohio State tax lien from 2021," and asserted that Nemer had "a history of driving offenses in the late 1990s and early 2000s." *Id*. ¶ 53 (citation modified).

Tellingly, Owen did not state that Nemer was fired because of her alleged tax mistakes or driving infractions, "nor even that those matters were a consideration in her termination." *Id*. ¶ 54. Indeed, Owen appears to have been "deliberately misleading and evasive." *Id*. She "avoided asserting any causal connection between these stale (and previously reported) infractions" and Nemer's termination, while creating "the misleading impression that the prior infractions were somehow connected" to the termination "by mentioning them in sequence, intending that the reader would fill in the gaps." *Id*.

On September 25, 2025, the Department of Justice EEO office reversed course, and dismissed Nemer's Title VII complaint. *Id*. ¶ 59. The final agency decision concluded that Nemer's termination was a "lawful exercise of the Attorney General's authority under Article II of the Constitution" and that any statute that "provides otherwise," including Title VII, "would run afoul of Article II." ECF No. 1-8, at 3.

Nemer filed this lawsuit. Defendants filed a motion to dismiss ("Mot."), ECF No. 15, in which they echo the constitutional arguments the Department articulated in the final agency decision. This opposition follows.

## LEGAL STANDARD

"A Rule 12(b)(6) motion tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation modified). When deciding a Rule 12(b)(6) motion, the court must treat the complaint's "[f]actual allegations" as "true," and it must "construe the complaint in favor of

6

the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (citation modified).

A complaint's factual allegations, taken as true and construed in favor of the plaintiff, need only raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 555. This standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal" conduct. *Id*. at 556. Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Id*. A claim is "plausible on its face" when the facts pled in the complaint allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation modified).

## ARGUMENT

The government's motion to dismiss raises two categories of arguments: first, a series of half-hearted threshold arguments, and second, the government's core constitutional theory that Article II prohibits any limits on the President's removal powers. Neither the government's small-bore attacks on the Complaint nor its Article II arguments hold any merit.

### I.    COUNTS ONE AND TWO ALLEGE VALID TITLE VII CLAIMS

Nemer has adequately alleged violations of Title VII for her termination based on her sex (female) and her national origin (Lebanese).

#### A.    Applicable Law

Title VII of the Civil Rights Act prohibits discrimination in employment based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1) (prohibition imposed on private, state, and local employers). These protections extend to the federal workforce. 42 U.S.C. § 2000e-

16(a).[3]  To state a Title VII discrimination claim, a plaintiff must plausibly allege that (1) she "suffered an adverse employment action" (2) "because of [her] race, color, religion, sex, [or] national origin."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

At summary judgment, a plaintiff "may prove discrimination through circumstantial evidence using the familiar three-part burden-shifting framework" from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973).  *Townsend v. United States*, 236 F. Supp. 3d 280, 297 (D.D.C. 2017).  First, the plaintiff bears the burden of establishing a "prima facie case" of discrimination;  second, the employer must articulate a "legitimate, nondiscriminatory reason" for terminating the plaintiff; and finally, the plaintiff must show that the employer's articulated reason is a pretext to mask unlawful discrimination.  *McDonnell Douglas*, 411 U.S. at 802-04.

But, contrary to Defendants' suggestion (Mot. 4-5), "a plaintiff need not plead facts establishing a *prima facie* Title VII case to survive a motion to dismiss."  *Townsend*, 236 F. Supp. at 309; *see also Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir 2008) ("At the motion to dismiss stage, the district court cannot throw out a complaint even if the plaintiff did not plead the elements of a prima facie case.").  The *McDonnell Douglas* framework "is an evidentiary standard, not a pleading requirement."  *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002).[4] Thus, at the motion-to-dismiss stage, "the guiding lodestar is whether, assuming the truth of the

---

[3] Despite minor differences in the language of the statutory provisions governing private employers and federal agencies, "Title VII places the same restrictions on federal and District of Columbia agencies as it does on private employers," and courts "construe the latter provision in terms of the former."  *Singletary v. District of Columbia*, 351 F.3d 519, 524 (D.C. Cir. 2003) (citation modified).

[4] *Swierkiewicz* remains "good law" after *Twombly* modified the standards that apply in evaluating motions to dismiss, as *Swierkiewicz* was "cited in and undisturbed by *Twombly*."  *Winston v. Clough*, 712 F. Supp. 2d 1, 13 n.10 (D.D.C. 2010).

factual allegations, taken collectively," the "inferences of discrimination drawn by the plaintiff are reasonable and plausibly supported." *Townsend*, 236 F. Supp. 3d at 298.

To be sure: While a plaintiff is not *required* to allege a prima facie case of discrimination in her complaint under *McDonnell Douglas*, such allegations are *sufficient* to state a claim of discrimination that should proceed to discovery. *See Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017); *Castleberry v. STI Group*, 863 F.3d 259, 266 (3d Cir. 2017). And, even at the summary-judgment stage, the "prima facie burden . . . is not onerous." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 309 (2025) (citation modified). To make out a prima facie case of discrimination, a plaintiff must demonstrate only that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005) (citation modified). "One method by which a plaintiff can satisfy the third prong of this test is by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class." *Id.* And "another way" to satisfy the third prong is to show "that the discharge was not attributable" to two "common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether." *Id.*

### B.    Nemer has adequately alleged Title VII violations.

The Complaint alleges facts plausibly establishing that Defendants terminated Nemer because of her sex (female) and national origin (Lebanese).

First, the Complaint clearly alleges that Nemer's termination "was not attributable to the two . . . common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position all together," giving rise to "an inference of discrimination." *George*, 407 F.3d at 412; *see also Int'l Brotherhood of Teamsters v. United*

*States*, 431 U.S. 324, 358 n.44 (1977) (observing that disproving that a candidate lacked absolute or relative qualifications or there was an absence of a vacancy is alone sufficient "to create an inference that the decision [not to hire a candidate] was a discriminatory one").

The Department of Justice concluded Nemer was "the perfect candidate" for the job when it hired her. Compl. ¶ 30; ECF No. 1-4, at 2. Nemer had practiced immigration law and represented noncitizens before EOIR for 12 years. Compl. ¶ 30. She had also worked as a magistrate judge and had shown that she was able to manage a large docket and work in a high-volume, high-pressure environment. *Id*. After being hired, Nemer did not disappoint. Nemer's direct supervisor said that she was one of his best immigration judges. *Id*. ¶ 35. Indeed, Nemer consistently received the highest possible performance ratings, including on her last performance evaluation. *Id*. ¶¶ 35, 40.

There is also no indication that Nemer's position as an immigration judge was eliminated. Quite the opposite, on October 24, 2025, EOIR announced that it had hired eleven new permanent immigration judges—all of whom were male. *Id*. ¶ 71. After the filing of the complaint, EOIR announced that it hired no fewer than two immigration judges specifically for the Cleveland Immigration Court. Both judges are male. Press Release, U.S. Dep't of Justice EOIR, *EOIR Announces 15 Immigration Judges and 17 Temporary Immigration Judges* (Apr. 8, 2026), https://perma.cc/VQ2P-YFX3;[5] *see also Payne v. Dep't of Youth Rehab. Servs.*, No. 18-562, 2019 WL 804898, at *5-6 (D.D.C. Feb. 21, 2019) (finding plaintiff alleged a plausible claim of gender

---

[5] The Court may take judicial notice of this recent development posted on EOIR's website. *See Escobar Molina v. U.S. Dept. of Homeland Security*, 811 F. Supp. 3d 1, 44 n.32 (D.D.C. 2025) ("The law is well-settled that judicial notice may be taken of factual content found on official public websites of government agencies." (citation modified)); *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of facts available on the District of Columbia's website).

discrimination where she generally described her work history, identified instances of non-promotion, and alleged that the selected candidates were not members of plaintiff's protected class).

Meanwhile, Nemer has never received a coherent and valid reason for her discharge. Compl. ¶ 8. Instead, Defendants have provided "changes and inconsistencies in the stated reasons" for Nemer's termination, supporting an inference of discrimination. *Brady*, 520 F.3d at 495 n.3. When Nemer asked her superiors about her termination, neither her direct supervisor nor Hunsucker, the Acting Chief Immigration Judge, knew why Nemer was terminated. Compl. ¶¶ 8, 35, 38. In fact, when Nemer confronted Hunsucker about the reason for her firing, he "became awkward and evasive." *Id*. ¶ 38. During the EEO investigation, Hunsucker "maintained that— despite being instructed to terminate Ms. Nemer by Ms. Owen—he did not know the reason for her termination." *Id*. ¶ 48.

Similarly, Owen provided an evasive narrative of Nemer's firing during the investigation into Nemer's EEO complaint, further evidencing discrimination. *Id*. ¶¶ 49-58. Rather than providing a reason for Nemer's termination, Owen's affidavit recited certain facts about Nemer while studiously declining to connect them to Nemer's dismissal—a strategy that is itself suspicious and suggests discrimination was afoot. *Id*. Specifically, Owen noted two Ohio tax cases involving Nemer in 2010 and 2011, an Ohio tax lien from 2021, and Nemer's "history of driving offenses" in the late 1990s and 2000s. *Id*. ¶ 53; ECF No. 1-7, at 8-9. Significantly, "at no point" did Owen assert that the Department of Justice terminated Nemer "*because of* [her] alleged tax mistakes and driving infractions, nor even that those matters were a consideration in her termination." Compl. ¶ 54 (emphasis added); ECF No. 1-7, at 8-9. Indeed, "Owen knew that *the connection did not exist* [between these infractions and Nemer's firing] and that inventing one

11

under oath could expose her to legal consequences." Compl. ¶ 54 (emphasis in original). Owen thus failed to provide a "clear and reasonably specific explanation" for Nemer's termination that dispels an inference of discrimination. *Figeroa v. Pompeo*, 923 F.3d 1078, 1088 (D.C. Cir. 2019) (citation modified) (holding such an explanation is required at step two of *McDonnell Douglas*).

Even if Owen had provided these facts as grounds for justifying Nemer's termination, they raise an inference of discriminatory firing because the facts bear so little on whether Nemer is qualified to serve as an immigration judge. *See, e.g.*, *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (a court need not credit a defendant's justification where it is "so weak, implausible, inconsistent, or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination"). As the Complaint alleges, the infractions were extremely minor; they occurred years, and in some cases decades, before Nemer's termination; and the Department had long known about them. *Id.* ¶¶ 55-58. Nemer has thus provided allegations that are more than enough to "dispel any 'obvious alternative explanation[s]'" for her termination. *Ho v. Garland*, 106 F.4th 47, 54 (D.C. Cir. 2024) ("At the motion to dismiss stage, a plaintiff need not 'rule out every possible lawful explanation,' but rather only dispel any 'obvious alternative explanation[s].'" (quoting *Wilson v. Arkansas Dept. of Human Services*, 850 F.3d 368, 373 (8th Cir. 2017))). Plaintiff's Title VII claims can proceed to discovery based on these allegations standing alone.

Second, the Department's rush to fire Nemer also permits the factfinder to infer discrimination. *See Salazar v. Washington Met. Transit Auth.*, 401 F.3d 504, 508-09 (D.C. Cir. 2005) (unexplained deviations from established employment procedures permit a jury to infer discrimination); *Brady*, 520 F.3d at 495 n.3 (discrimination can be shown by "the employer's failure to follow established procedures or criteria"). Nemer was fired just fifteen days after the

new administration took office. Compl. ¶ 7. She was given no advance notice of her termination; in fact, she was on the bench in the courtroom when she was interrupted and told that she was terminated effective immediately. *Id*. ¶¶ 7, 32. Nor was Nemer ever given a coherent, nondiscriminatory reason for her firing. Historically, for the termination of an immigration judge, a memorandum is prepared for Department leadership regarding the termination and documenting the justification. *Id*. ¶ 46. In other proceedings, the government has disclosed these memoranda to former employees in the administrative process, but it did not do so here. *Id*. These allegations further support the inference that the decision to terminate Nemer was discriminatory.

Third, the Complaint alleges that Nemer was treated differently from similarly situated colleagues who were not female or of Lebanese origin, further supporting an inference of discrimination. *See George*, 407 F.3d at 412 (noting that one way to establish the third prong of a prima facie case is to show that the employee was "treated differently from similarly situated employees who are not part of the protected class"); *Burley v. National Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) ("A plaintiff can establish pretext masking a discriminatory motive by presenting 'evidence suggesting that the employer treated other employees of a different race . . . more favorably in the same factual circumstances.'" (quoting *Brady*, 520 F.3d at 495)). At the summary-judgment stage, factors bearing on whether an individual is an appropriate comparator include "similarity of the plaintiff's and the putative comparator's jobs and job duties," *Burley*, 801 F.3d at 301, and whether federal workers are probationary or permanent employees, *George*, 407 F.3d at 415. And the "burden at the summary judgment stage" with respect to "comparator" evidence is "substantially more onerous than the pleading burden" at the motion-to-dismiss stage. *Nanko Shipping*, 850 F.3d at 467.

13

The Complaint plausibly alleges that Nemer was treated differently from two relevant sets of comparators. *Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 530 (D.C. Cir. 2025) ("[A] plaintiff proceeding on . . . a comparator theory must plead enough facts about those comparators and the relevant context to allow a plausible inference that [s]he was treated differently because of [her status]."). To begin, the Complaint explains that Nemer was one of three immigration judges on the Cleveland Immigration Court who were in trial periods. *Id.* ¶¶ 33, 68, 75. However, neither of the two comparator judges—both of whom were male and neither of whom was of Lebanese origin—was let go alongside Nemer. *Id.* ¶¶ 33, 68-69, 75. In addition, Nemer was one of 38 immigration judges hired as part of the same class in July 2023, and yet none of the 37 others was fired when Nemer was. *Id.* ¶¶ 34, 76-77. Of this class, Nemer is the only one of Lebanese origin and the only one with dual citizenship in an Arab country. *Id.* ¶¶ 34, 76-77. These comparator allegations are sufficient, standing alone, to state a claim of discrimination at the pleading stage. *See, e.g.*, *Nanko Shipping*, 850 F.3d at 467 (plaintiff's allegations that defendant was aware of his race and treated his company less favorably than similarly situated white-owned companies were enough to survive a motion to dismiss under materially identical antidiscrimination law); *McNair v. District of Columbia*, 213 F. Supp. 3d 81, 87 (D.D.C. 2016) (plaintiff adequately pleaded Title VII claim by alleging that others with similar roles, but of a different race and color, were permitted to telework but plaintiff was not). And, of course, the comparator allegations are reinforced by the other allegations of discrimination discussed above.

Defendants resist this conclusion (Mot. 7-8), but they limit their argument to whether Nemer adequately pleaded that she was treated differently from similarly situated comparators. As explained above, however, Nemer's Title VII claims also rest on additional allegations that are, standing alone, sufficient to state a claim: (1) Nemer was not fired for misconduct or any

14

performance-based issue or due to a reduction in force; (2) Nemer's direct supervisor and the Acting Chief Immigration Judge could not explain why Nemer had been fired; (3) the Acting Director of EOIR refused to explain why Nemer was fired in response to an inquiry from an EEO investigator, instead providing an evasive response; and (4) the process used to fire Nemer was rushed and deviated from the normal procedure.

Regardless, Defendants' challenge to the comparator allegations fails on its own terms as well. Defendants first mistakenly assert (Mot. 7 n.3) that Nemer "makes no allegations regarding whether the other immigration judges in Cleveland were in their trial period." Defendants overlook that the Complaint states that "Ms. Nemer was *one of three immigration judges in their trial periods* in the Cleveland Immigration Court," Compl. ¶ 68 (emphases added), and that the "other two immigration judges *in their probationary periods* in the Cleveland Immigration Court" were not let go alongside Plaintiff, *id*. ¶ 75 (emphases added). *See also id*. ¶ 33 (similar).

Defendants fault Plaintiff (Mot. 7) for not specifying whether the two sets of comparator immigration judges "had . . . issues with their background checks" that were "analogous" to Nemer's tax and driving issues referenced in Owen's affidavit. But Nemer did not have to allege such detailed facts at the motion-to-dismiss stage, particularly given that Owen's affidavit did not connect Nemer's prior tax and traffic infractions to her termination. *See supra* pp. 11-12. Rather, Plaintiff identified comparators who were similarly situated to her in the only ways that appeared to be potentially relevant—that they were immigration judges who were still in their initial two-year trial periods.

The cases on which Defendants rely (Mot. 6-8) are not to the contrary. For example, in *Joyner*, the plaintiff merely alleged in a footnote that his comparators were "three Caucasian attorneys who began [with the employer] either before or after him." 140 F.4th at 532. The court

15

reasoned that those scant allegations "d[id] not show that [the plaintiff] and his comparators worked in the same position in a meaningful sense." *Id*. By contrast, here, the Complaint alleges that Plaintiff's comparators are immigration judges, just like Plaintiff, with a similar length of tenure. *See, e.g.*, Compl. ¶¶ 33, 34 68, 75-76. And in *Holmes v. Austin*, No. 23-2415, 2024 WL 4345829, at *6 (D.D.C. Sep. 30, 2024), a black nurse alleged that she had been reprimanded because of documentation errors in her charts while Caucasian nurses under forty had not. However, the court noted that the plaintiff did not allege that these younger, Caucasian nurses also had documentation errors in their charts, and thus, in "the absence of such factual allegations, the court [was] left to speculate." *Id*. In contrast, further "factual allegations" are unnecessary here because Defendants have not provided *any* coherent rationale for terminating Plaintiff, and the tax and driving infractions (if that is the supposed reason) would plainly not justify terminating Nemer.

### C. Nemer exhausted the relevant administrative process.

Nemer also properly exhausted her Title VII claim. A federal employee satisfies Title VII's administrative exhaustion requirements where she "initiate[s] contact with [an agency] Counselor . . . within 45 days of the effective date of the [personnel] action," 29 C.F.R. § 1614.105(a)(1); files a timely formal discrimination complaint with her agency's EEO office, *id*. § 1614.106(b); and then timely files suit after receiving a final agency decision on that complaint, 42 U.S.C. § 2000e-16(c). *See generally Al-Saffy v. Vilsack*, 827 F.3d 85, 88-89 (D.C. Cir. 2016).

Defendants do not dispute that Nemer satisfied these requirements. *See* Compl. ¶¶ 42-44. Defendants instead argue that Nemer did not sufficiently exhaust the administrative process because she mistakenly filed an appeal with the MSPB before filing her EEO complaint and was required to "complete MSPB exhaustion." Mot. 8. In other words, the government appears to be arguing that Nemer had to maintain her case before the MSPB, despite everyone agreeing she had

16

no rights to proceed to the MSPB.[6]  Under the government's theory, when Nemer instead sought a voluntary dismissal of her MSPB appeal after identifying her obvious error, Compl. ¶ 60 n.3, she somehow extinguished her Title VII claims.  That position is as incorrect as it sounds for two independent reasons.

As an initial matter, the plain language of the regulations on which Defendants rely do not require Plaintiff to go through the pointless exercise of pursuing a meaningless MSPB appeal— she had no MSPB rights—after she realized that the MSPB lacked jurisdiction.  The regulations direct employing agencies to dismiss an EEO complaint where an employee "has raised the matter . . . in an appeal to the [MSPB] *and* . . . § 1614.302 indicates that the [employee] has elected to pursue the non-EEO process."  29 C.F.R. § 1614.107(a)(4) (emphasis added).  Section 1614.302, in turn, governs when such an "election" has occurred—and when "dismiss[al]" on "th[at] basis" is permitted—for "a mixed case complaint," *id.* § 1614.302(c)(2), which is an EEO complaint concerning an "action that can be appealed to the . . . MSPB," *id.* § 1614.302(a)(1).

Section 1614.302 describes only two scenarios in which it is appropriate to dismiss an EEO complaint or hold it in abeyance based on a pending MSPB appeal.  Neither scenario is present here.  First, "[w]here neither the [employing] agency nor the MSPB administrative judge questions the MSPB's jurisdiction over the appeal . . . , [the employing agency] shall dismiss the mixed case complaint."  29 C.F.R. § 1614.302(c)(2)(i).  Second, where the "[employing] agency or the MSPB administrative judge questions the MSPB's jurisdiction[,] . . . the [employing] agency shall hold

---

[6]  As Defendants do not dispute, the MSPB clearly lacked jurisdiction over Plaintiff's appeal because she was in her position for less than two years and thus was not an "employee" who could challenge her removal under 5 U.S.C. §§ 7513(d) and 7701(a).  *See* 5 U.S.C. § 7511(a)(1)(C)(ii) (providing in relevant part that individuals like Plaintiff serving in the "excepted service" who are not "preference eligible" are "employees" only if they have "completed 2 years of current continuous service" in certain positions); 5 C.F.R. § 752.401(c)(5); *Roy v. MSPB*, 672 F.3d 1378, 1380-82 (Fed. Cir. 2012); *see also, e.g.*, ECF No. 1-4, at 3.

the mixed case complaint in abeyance until the MSPB's administrative judge rules on the jurisdictional issue." *Id*. § 1614.302(c)(2)(ii). If the MSPB dismisses the case, then the employing agency must process the EEO complaint. *Id.*

This case involves a third scenario. It was *certain* that the MSPB *lacked* jurisdiction over Nemer's prior MSPB appeal, and Nemer accordingly sought and obtained voluntary dismissal of her MSPB case *before* filing her EEO complaint. ECF No. 1-8, at 2. Nothing in the regulation requires dismissing Nemer's later-filed EEO complaint in this circumstance, nor does anything require a court to find she failed to exhaust her administrative remedies. Indeed, accepting the government's bizarre arguments would create the worst kind of gotcha scenario in which federal employees—many of whom proceed pro se through these administrative fora—attempt to rectify their mistakes and find themselves irrevocably out of luck. This hyper-formality makes no sense— which is why it is not required by the regulations. Moreover, if the regulations do require that perverse result, they are patently arbitrary and capricious. *Cf. Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 823 (2024).

Regardless, there is an even more basic reason that the government's exhaustion argument fails: It is well settled that "[e]xhaustion of [Title VII] administrative remedies is not required where exhaustion would be futile." *Harris v. Attorney General of U.S.*, 657 F. Supp. 2d 1, 13 (D.D.C. 2009) (citing *James v. U.S. Dept. of Health & Human Servs.*, 824 F.2d 1132, 1138 (D.C. Cir. 1987) (recognizing administrative exhaustion would be futile where an adverse decision was certain)); *cf. Artis v. Bernanke*, 630 F.3d 1031, 1034 n.4 (D.C. Cir. 2011) (explaining that "failure to exhaust administrative remedies is not jurisdictional" in Title VII cases). "Resort to administrative remedies is 'futile' and adverse action certain, if the denial of relief would result from a prior indication from the agency that it does not have jurisdiction over the matter or it has

18

evidenced a strong position on the issue together with an unwillingness to reconsider." *James*, 824 F.2d at 1139; *see also Nelson v. Blinken*, No. 18-1880, 2023 WL 7156516, at \*4 (D.D.C. Oct. 31, 2023) (similar, in Title VII case).

It would have been plainly futile for Nemer to continue to pursue her meritless MSPB case—the path Defendants claim she was required to pursue. Had Nemer maintained the MSPB action, there is no question that the MSPB would have dismissed the case for lack of jurisdiction, *see supra* p. 17 n.6, at which point the Department of Justice would have been required to process her EEO complaint, *see* 29 C.F.R. § 1614.302(c)(2)(ii).

It is equally clear that the MSPB's dismissal for lack of jurisdiction would not have altered the Department's substantive decision to dismiss Plaintiff's EEO complaint on Article II grounds. ECF No. 1-8, at 2-7; *see also Harris*, 657 F. Supp. 2d at 13 (holding exhaustion of Title VII claim was excused as futile where exhaustion "would have made no difference" and defendant "mounted no opposition to this contention"). Indeed, it bears emphasizing how remarkably picayune the government's exhaustion argument is. The Department of Justice issued a fulsome, multiple-page decision holding that Title VII cannot apply to Nemer because the statute conflicts with Article II. Had Nemer done everything Defendants wanted and received a dismissal from the MSPB, the Department would still have dismissed the EEO complaint for the same exact reasons. This is a textbook case of futility.

## II.     COUNT THREE ALLEGES A VALID FIRST AMENDMENT CLAIM.

Nemer also adequately alleged that she was removed from her position based on her political affiliation in violation of the First Amendment.

### A.   Applicable Law

Under the United States Constitution, "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Elrod v. Burns*,

427 U.S. 347, 356 (1976) (plurality op.) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)).  The First Amendment generally forbids political patronage, in which "public employees hold their jobs on the condition that they provide, in some acceptable manner, support for the favored political party." *Id.* at 359; *see also, e.g.*, *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 68-71 (1990) (explaining that the government can generally "ensure employee effectiveness and efficiency through the less drastic means of discharging staff members whose work is inadequate"); *Branti v. Finkel*, 445 U.S. 507, 519 (1980).  Nor, "except in the most compelling circumstances," may the government "wield[] its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate."  *Rutan,* 497 U.S. at 76. "[C]onditioning public employment on the provision of support for the favored political party 'unquestionably inhibits protected belief and association.'"  *Id.* at 69 (quoting *Elrod*, 427 U.S. at 359).

Under the First Amendment, "[g]overnment officials" therefore "may not discharge public employees for refusing to support a political party or its candidates, unless political affiliation is a reasonably appropriate requirement for the job in question." *O'Hare Truck Serv.*, 518 U.S. at 714. For instance, an incoming County Sheriff may not maintain a "practice" of replacing "employees of the Sheriffs' [*sic*] Office with members of his own party when the existing employees lack or fail to obtain requisite support from" the new Sheriff's political party. *Elrod*, 427 U.S. at 351; *see Branti*, 445 U.S. at 510. And "a patronage system involving the wholesale dismissal of public employees for partisan reasons, applied without regard to an employee's responsibilities," violates the First Amendment. *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 239 (1st Cir. 1986) (citing *Elrod*, 427 U.S. at 367).

20

**B.    Nemer has adequately alleged a First Amendment claim.**

For reasons similar to those discussed with respect to Nemer's Title VII claims, the Complaint alleges facts plausibly establishing that Defendants terminated Nemer because of her political affiliation.  In particular, Defendants targeted Nemer because she was associated with the Democratic Party after she ran for election in 2019 as a judge for the Stow Municipal Court. Compl. ¶ 29.

The Complaint alleges that Department decisionmakers "were aware of Ms. Nemer's . . . political background at the time termination decisions were made," as information about her prior campaign for public office was in her personnel file; the campaign was a matter of public record and could easily be discovered with a basic internet search; and Nemer posted campaign signs in communities in which her colleagues lived.  Compl. ¶¶ 36, 82.  Indeed, then-Acting Chief Immigration Judge Hunsucker noted to Nemer that they lived in the same city, and she understood that he knew that fact because of her posted campaign signs.  *Id*. ¶ 82.  In addition, the Complaint alleges that "[a]nother immigration judge had similarly spoken to Nemer about her campaign for office," underscoring that Nemer's colleagues were aware of her political activity.  *Id.*

Defendants contend (Mot. 9-10) that "Plaintiff makes no plausible allegation that the only two individuals involved in her removal—the Acting EOIR Director and the Acting Attorney General—knew anything about her or her political history."  But Plaintiff need not include specific allegations conclusively establishing that those individuals had such knowledge at the motion-to-dismiss stage.  *Cf. Williams v. District of Columbia*, 317 F. Supp. 3d 195, 200 (D.D.C. 2018) (observing that the "depth of the terminating officials' knowledge" of a Title VII plaintiff's protected status raises a "factual question[] . . . not properly resolved at the motion to dismiss stage when all reasonable inferences must be drawn to the plaintiff's benefit" (quoting *Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 723 (D.C. Cir. 2007)).

21

Moreover, Defendants completely ignore allegations that (1) information about Nemer's prior campaign for public office was in her personnel file, which presumably the decisionmakers reviewed before firing her; and (2) Nemer's campaign was a matter of public record and could easily be discovered with a basic internet search. Compl. ¶¶ 36, 82. Those allegations, together with allegations showing that Nemer's colleagues—including Hunsucker, who reported directly to Owen when Nemer was fired, ECF No. 1-6, at 2—were aware of Nemer's political campaign are more than enough to give rise to an inference that Owen and the Acting Attorney General were aware of Nemer's prior political activity.

Defendants do not dispute that the Complaint otherwise adequately alleges the causation element of her First Amendment political-affiliation claim. With good reason. The timing of Nemer's firing strongly supports her claim that she was fired based on her political affiliation in violation of the First Amendment. Defendants terminated her just fifteen days after the change in political administrations. Compl. ¶ 7. This "lightning-fact, precipitous timing" indicates that the incoming administration made its decision "not as part of a careful evaluation of Ms. Nemer's qualifications or fitness for office," but rather to terminate those with differing political views. *Id*.; *see Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 136 (D.D.C. 2025) (Sooknanan, J.) (finding "retaliatory animus" where Federal Trade Commission Chairman "wasted no time after taking office to initiate" "investigation"), *appeal dismissed per stipulation*, No. 25-5302, Order (D.C. Cir. May 4, 2026); *cf. BEG Invs., LLC v. Alberti*, 144 F. Supp. 3d 16, 22 (D.D.C. 2015) ("Causation may be inferred—especially at the pleading stage—when the retaliatory act follows close on the heels of the protected activity." (citation modified)).

Further supporting Nemer's claim, and as detailed extensively above (at pp. 12-13), the Complaint alleges that Defendants employed unusual and unexplained maneuvers to fire Nemer,

who by all accounts was an outstanding employee.  Compl. ¶¶ 32, 35, 40, 46.  For example, the Department did not follow its "[h]istorical[]" practice of disclosing to Plaintiff during the EEO proceedings a memorandum articulating a justification for Plaintiff's termination.  *Id.* ¶ 46.  And the Department's claimed basis for Nemer's termination has been unclear and has changed.  *See Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 46 (D.D.C. 2021) (citing "shifting and insufficient explanations" as providing a basis for the "reasonable inference" that Defendants acted "in retaliation for Plaintiffs' exercise of protected First Amendment activity"), *aff'd on other grounds sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023).  Indeed, Nemer's supervisors at all levels have repeatedly been unable to explain her firing, and Owen was studiously evasive in responding to questions about the basis for Nemer's termination during the EEO proceedings.  Compl. ¶¶ 8, 35, 38, 48-58.  The Department's erratic and inconsistent conduct—together with its awareness of her prior political activity, the suspicious timing of the termination, and the Department's rushed decision-making—is more than enough at the motion-to-dismiss stage to raise an inference that Nemer was fired because of her political affiliation.

Significantly, Defendants do not dispute that the First Amendment bars the federal government from making party affiliation a condition of employment as an immigration judge.[7] That is for good reason.  Such a condition is allowed only in the rare circumstance when political affiliation is "an appropriate requirement for the effective performance of the public office

---

[7]  To be sure, in arguing against a First Amendment *free-speech* claim that Defendants perceive Plaintiff to be asserting under *Pickering v. Board of Education*, 391 U.S. 563 (1968), Defendants contend that Nemer "falls within the high-level policy group for which there are stronger governmental interests in regulating *speech*."  Mot. 15 (emphasis added); *see also* Mot. 12-16.  In making this argument, Defendants rely on a variant of the *Branti* doctrine that is "[t]ailored for *Pickering* speech cases."  Mot. 13.  Defendants do not, however, make a parallel argument with respect to Plaintiff's First Amendment *political-affiliation* claim, which would require them admit that the federal government seeks to hire and fire immigration judges—longtime career civil servants—based on their political affiliation.

involved," *Branti*, 445 U.S. at 518, and that is plainly not the case here. Rather, "[i]mmigration judges are career civil-service employees" within the Department of Justice. *Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 670 (D.C. Cir. 2016). Specifically, they are "attorney[s]" appointed by the Attorney General, 8 U.S.C. 1101(b)(4), to "preside over deportation, exclusion, removal, recission, and bond proceedings for noncitizens charged with violating the immigration laws," subject to further review within the Department of Justice. *Am. Immigr. Laws. Ass'n*, 830 F.3d at 670 (citation modified); *see also infra* pp. 29-34. Indeed, a recent memorandum issued by then-Acting Director of EOIR Owen emphasizes that immigration judges are not "policy advocates" and instead must be "neutral" and "impartial" adjudicators; "remain free from bias"; and avoid being "swayed by partisan interests." Sirce E. Owen, Acting Director, Executive Office of Immigration Review, U.S. Dep't of Justice, Neutrality and Impartiality in Immigration Court Proceedings 1-2 (June 27, 2025), https://tinyurl.com/27xwn2b5 (citation modified).

Accordingly, political affiliation is not "an appropriate requirement for the effective performance" of an immigration judge, *Branti*, 445 U.S. at 518, just as it is irrelevant to the effective performance of comparable civil service jobs throughout the federal government and in state government. *See, e.g.*, *Horne v. MSPB*, 684 F.2d 155, 158 (D.C. Cir. 1982) (explaining that career attorneys who served as attorney-advisors to commissioners of both political parties of the Interstate Commerce Commission appeared not to be political employees who could be dismissed based on political affiliation). Indeed, the role of an immigration judge is decidedly distinct from positions that courts have said may be conditioned on an employee's political affiliation, such as "assistants who help [a Governor of a State] write speeches, explain his views to the press, or communicate with the legislature"—duties a Governor could appropriately think "cannot be

24

performed effectively unless those persons share his political beliefs and party commitments."
*Branti*, 445 U.S. at 518.

Finally, Defendants argue (Mot. 10-16) at length that Plaintiff has not stated a First Amendment *free-speech* claim under *Pickering v. Board of Education*, 391 U.S. 563 (1968). They miss the point. Nemer did not seek to assert a speech claim in her Complaint. She alleged a claim based on her political association. Count Three of the Complaint should not be dismissed.

## III. ARTICLE II DOES NOT GRANT THE FEDERAL GOVERNMENT AUTHORITY TO VIOLATE TITLE VII OR THE FIRST AMENDMENT.

With those threshold arguments resolved, Defendants' primary legal theory (Mot. 17-24) comes into focus: Defendants make the breathtaking argument that Article II of the Constitution stamps out Nemer's rights under Title VII and the First Amendment. This sweeping position runs headlong into longstanding precedent—from *Perkins*, 116 U.S. 483, to *United States v. Arthrex, Inc.*, 594 U.S. 1 (2021)—which makes clear that Article II does not grant the President the unrestricted authority to remove inferior officers. This Court should soundly reject the government's invitation to overturn more than a century of precedent and practice.

### A. Article II does not grant the President unfettered authority to remove inferior officers.

The President's constitutional removal authority is principally grounded in the Appointments Clause. U.S. Const. art. II, § 2, cl. 2. That clause specifies that "Officers of the United States" shall be nominated by the President with the "Advice and Consent of the Senate," except that "the Congress may by Law vest the Appointment of . . . inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id*. For purposes of the Appointments Clause, federal workers thus "fall into three categories: (i) principal officers, who must be appointed by the President with the advice and consent of the Senate; (ii) inferior officers, who can be appointed by the President, the head of a department, or a court

25

of law; and (iii) non-officer employees, whose appointments are unaddressed (and thus unconstrained) by the Clause." *Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1096 (D.C. Cir. 2021). An officer is "inferior" rather than "principal" "if her work is directed and supervised at some level by principal officers," such as the Attorney General and others who report directly to the President. *Id.* at 1103 (citation modified); *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 761 (2025). The parties agree that immigration judges—who are appointed by the Attorney General, 8 U.S.C. § 1101(b)(4)—are "inferior officers."

The Supreme Court has squarely held that executive branch officials do not have unfettered Article II authority to remove "inferior officers." Nearly a century and a half ago, the Court explained in *Perkins* that it "ha[d] no doubt" that when Congress vests the appointment of inferior officers in the heads of agencies, "it may limit and restrict the power of removal as it deems best for the public interest." 116 U.S. at 485. As the Court explained, the Appointments Clause's grant of "authority" to Congress to "vest" appointment of inferior officers in agency heads also "implies authority to limit, restrict, and regulate . . . removal." *Id.* Applying that principle, the Court rejected the government's constitutional challenge to a federal statute limiting the circumstances in which an inferior officer could be removed. *Id.* (noting statutory bars on discharge of naval officers except by court martial or for misconduct).

A hundred years later, in *Morrison*, the Supreme Court confirmed that where "Congress ha[s] chosen to vest the appointment of 'inferior' executive officials in the head of a department," there is no "specific constitutional impediment to congressionally imposed restrictions on the President's removal powers." 487 U.S. at 689 n.27 (citation omitted). The Court upheld the constitutionality of a statute providing "good-cause tenure protection" to an "independent counsel appointed to investigate and prosecute particular alleged crimes by high-ranking Government

26

officials"—an "inferior officer" the Court described as "[having] limited jurisdiction and tenure" and "lacking policymaking or significant administrative authority." *Seila Law LLC v. CFPB*, 591 U.S. 197, 217-18 (2020) (quoting *Morrison*, 487 U.S. at 691). *Morrison* emphasized that the statute "g[a]ve the Attorney General," who is directly responsible to the President, "several means of supervising or controlling" the independent counsel—"[m]ost importantly, . . . the power to remove the counsel for 'good cause.'" 487 U.S. at 695-96.

Justice Scalia—an ardent advocate of the Article II removal power—agreed in *Morrison* that the President lacks "plenary power to remove inferior officers." 487 U.S. at 724 n.4 (Scalia, J., dissenting). Justice Scalia explained that even when Congress specifies that inferior officers are "removable [only] *for cause*," the President retains "control over all exercises of the executive power" because "cause" includes "the failure to accept supervision," and inferior officers' politically accountable superiors—principal officers—are removable at will. *Id.*

Other Supreme Court decisions have repeatedly affirmed the principles articulated and applied in *Perkins* and *Morrison*. For example, *Myers*, 272 U.S. 52, is best remembered as the historical high-water mark for the President's power to remove officers he has appointed with the advice and consent of the Senate. *Id.* at 163-64, 176. But that decision also repeatedly explained that—when it came to inferior officers appointed by the head of a Department—Congress may "restrict[]" "the power of removal." *Id.* at 161; *see also id.* at 127, 160, 162, 164. *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 483, 494 (2010), likewise reiterated the principles enunciated in *Perkins* and *Morrison* while striking down a statute granting certain inferior officers *two* layers of for-cause removal protection. Significantly, the Court stressed that it was not calling into question the constitutionality of the "civil service system" or for-cause removal protections for administrative law judges. *Id.* at 507 & n.10.

27

Most recently, in *Arthrex*, the Supreme Court expressly sanctioned Congress's adoption of for-cause removal protections for inferior officers performing adjudicatory functions. *Arthrex* held that a statute granting substantial authority to administrative patent judges appointed by the Secretary of Commerce violated the Appointments Clause. 594 U.S. at 13-14, 23. The Court reasoned that the judges were functioning as principal officers—not inferior officers—because the statute allowed them to issue unreviewable decisions and because they could be removed by principal officers only "for such cause as will promote the efficiency of the service." *Id.* at 14-17 (quoting 5 U.S.C. § 7513(a)). As a result, the judges' appointment by an agency head was inconsistent with the Appointments Clause. *Id.* at 12-13, 23.

*Arthrex*'s remedial holdings are particularly significant in this case. In evaluating which statutory provisions the Court should sever to render administrative patent judges inferior officers and cure the constitutional defect, the Court expressly *declined* to excise the judges' for-cause removal protections. 594 U.S. at 25-26. Instead, the Court cured the constitutional problem by subjecting the judges' decisions to review by a principal officer. *Id.* at 23-26. *Arthrex* could not have applied that remedy—which preserved civil service removal protections for inferior officers—if those protections ran afoul of Article II. The Court recognized as much, emphasizing that the statutory scheme that survived its decision ensures that "the President remains responsible for the exercise of executive power—and through him, the exercise of executive power remains accountable to the people." *Id.* at 27.

The Supreme Court reiterated the point last year in *Braidwood Management*. Citing *Arthrex*, the Court explained that "[i]f an adjudicative officer's decisions are reviewable by a superior, then the officer may be considered inferior *even if not removable at will*." *Braidwood*, 606 U.S. at 765 (emphasis added). The Court emphasized that when a principal officer has the

28

authority to review an inferior officer's decision before it takes effect, it follows that the inferior officer "cannot make any legally binding, final decision on behalf of the United States" if the principal officer "disagrees and wants to block it." *Id.* at 766. "As a result," the principal officer "retains ultimate responsibility." *Id.*; *see also id.* at 767, 769. Indeed, "higher-level agency reconsideration by the agency head is the standard way to maintain political accountability and effective oversight for adjudication." *Id.* at 775 (citation modified).

> **B.      Article II does not authorize federal officials to violate immigration judges' rights under Title VII and the First Amendment.**

1.      Defendants lack unfettered authority to remove immigration judges under this longstanding constitutional framework. The parties agree that immigration judges are "inferior officers" within the meaning of Article II. By statute, immigration judges are appointed by the Attorney General—a principal officer appointed by the President with the advice and consent of the Senate. *See* 8 U.S.C. § 1101(b)(4); 28 U.S.C. § 503. Immigration judges "shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe." 8 U.S.C. § 1101(b)(4).

Because immigration judges are inferior officers appointed and supervised by the Attorney General, it follows from *Perkins* and *Morrison* that Congress is entitled to protect them from arbitrary abuse and discrimination consistent with Article II. Congress has done so in part through Title VII, which expressly bars discrimination in federal employment based on race, color, national origin, sex, and religion. 42 U.S.C. § 2000e-16(a). Meanwhile, just as Congress may protect immigration judges from discrimination without running afoul of Article II, so too the First Amendment protects immigration judges from the government's inappropriately conditioning employment on political affiliation. *Branti*, 445 U.S. at 518.

As Justice Scalia explained, these modest restrictions against sex, national origin, and associational discrimination do not entrench on the President's ability to "control" "the executive power" because immigration judges can be removed if they "fail[] to accept supervision." *Morrison*, 487 U.S. at 724 n.4 (Scalia, J., dissenting) (so concluding with respect to even more stringent *for-cause* removal protections); *see also id.* at 695-96 (majority op.). Indeed, it would be laughable to think that the President's ability to control the executive branch is impeded in the slightest by prohibiting him from discriminating against Nemer in ways—such as her sex—that have no bearing on her ability to perform her job.

*Arthrex* puts the matter to bed. In *Arthrex*, the Supreme Court held that it was enough for a principal officer to review administrative patent judges' decisions, even if those judges could be removed only for cause. 594 U.S. at 17, 23-27. That describes this case. Immigration judges "shall be subject to such supervision . . . as the Attorney General shall prescribe." 8 U.S.C. § 1101(b)(4). Meanwhile, the Attorney General has the authority to review and correct immigration judges' individual decisions. *See In re J.F.F.*, 23 I. & N. Dec. 912, 913 (A.G. 2006) (explaining that the Attorney General may "review de novo all aspects" of immigration judges' "decision[s]," "receive additional evidence," and make "de novo factual determinations" (citation modified)); *see also, e.g.*, 8 U.S.C. § 1103(g)(2); 8 C.F.R. § 1003.1(h)(1)(i).

To be clear: The Attorney General "need not review every decision" to ensure each immigration judge remains "accountable to the people." *Arthrex*, 594 U.S. at 27. "What matters is that the" Attorney General has "the discretion to review decisions rendered by" immigration judges. *Id*. "In this way, the President remains responsible for the exercise of executive power." *Id*. There is thus no Article II concern with prohibiting the President from discriminating based on sex, national origin, or political affiliation when such affiliation has no bearing on effective

30

performance. And finally, *Arthrex* also teaches that if there is some regulatory impediment to the Attorney General's review, the appropriate remedy is to sever that impediment, not subject the inferior officer to at-will removal. *Id*. at 25-27 (explaining this "tailored approach" as better reflecting "the structure of supervision" and "the nature of" the adjudicatory "duties" administrative judges perform).

Finally, if that all were not enough (it is), the Supreme Court has indicated that civil service protections are particularly permissible for those, like immigration judges, who "perform adjudicative" functions. *Free Enter. Fund*, 561 U.S. at 507 n.10. Such adjudication, moreover, is *not* "policymaking." *Id*. (administrative law judges "perform adjudicative" not "enforcement or policymaking functions").

**2.** Defendants' arguments to the contrary are meritless. Defendants principally rely (Mot. 19-21) on a half-sentence of dictum from *Seila Law*, in which the Supreme Court characterized *Morrison* as having permitted for-cause removal protections only for inferior officers "with limited duties and no policymaking or administrative authority." 591 U.S. at 218. According to Defendants, that half-sentence radically narrowed *Perkins* and its progeny into oblivion.[8]

That is incorrect. *Seila Law* confirmed that "history and precedent" are the primary guides in evaluating the scope of the President's Article II removal power. 591 U.S. at 214. By that metric, Title VII and the First Amendment pass in spades. Civil service laws are far from "novel," *id*. at 215, given that their roots go back at least a century and a half (if not more). *See, e.g.*, *Frazier*

---

[8] In making these arguments, Defendants rely heavily on the MSPB's recent decision in *Jackler v. DOJ*, 2026 M.S.P.B. 3, 2026 WL 789485 (Mar. 20, 2026). In *Jackler*, the MSPB—a supposedly independent agency, whose sole-Democratic member was nevertheless removed by the President—agreed with the Department that Article II "abrogates otherwise-applicable statutory removal protections" for immigration judges. 2026 WL 789485, at *1. *Jackler* was wrongly decided and is currently on appeal in the Federal Circuit. *See Jackler v. DOJ*, No. 26-1575 (Fed. Cir.).

31

*v. MSPB*, 672 F.2d 150, 153-54 (D.C. Cir. 1982).  Similarly, the First and Fifth Amendments—the latter of which includes prohibitions on employment discrimination parallel to those in Title VII, *see Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 825 (1976)—date back to shortly after the Nation's founding.  In addition, *Seila Law* concerned the President's authority to remove a principal officer, not an inferior officer.  591 U.S. at 238.  The half-sentence comment on which Defendants rely was therefore dictum with no relevance to *Seila Law*'s outcome.

Even if *Seila Law* meant to articulate a new legal test for when civil service protections may apply to inferior officers (it did not), the test would be capacious—not narrow.  When *Seila Law* referenced officials with "limited duties and no policymaking or administrative authority," 591 U.S. at 218, it was describing the independent counsel in *Morrison*, who had the authority to investigate and prosecute "crimes by high-ranking Government officials."  *Id.* at 217.  If that powerful prosecutor could be protected from removal without cause, middle-management federal employees like Nemer—who have far more modest responsibilities and authority—can be protected from improper termination based on sex, national origin, and political affiliation.  To top it off, *Arthrex* confirmed that civil service laws may apply to administrative adjudicators like immigration judges without expressing *any* concern that they exercised more than "limited duties" or wielded "policymaking or administrative authority."

Defendants resist this conclusion (Mot. 21), emphasizing that immigration judges can hear a range of immigration cases and exercise their "independent judgment and discretion" in deciding cases. Mot. 21 (quoting 8 C.F.R. § 1003.10(b)).  But the cited regulation specifies that immigration judges must exercise such judgment and discretion "subject to the applicable standards set forth in paragraph (d)."  8 C.F.R. § 1003.10(b).  Paragraph (d), in turn, says that "[i]mmigration judges shall be governed by," among other things, (1) "decisions of the Board [of Immigration Appeals],"

32

all of which are subject to plenary review by the Attorney General, *id.* § 1003.1(h)(1)(i); and (2) directives from "the Attorney General" issued on "review of a decision of the Board" or through a "written order." *Id.* § 1003.10(d).  In short, immigration judges must follow instructions from their superiors at the Department of Justice when deciding cases.  *See Garcia v. Garland*, 64 F.4th 62, 75 n.12 (2d Cir. 2023).

Moreover, the Attorney General has plenary authority to review and overturn all decisions made by immigration judges, and thus any "independent judgment" they exercise is limited to "generating recommendations on the front end," while "political accountability and effective oversight for adjudication" on the back end are fully "maintain[ed]." *Braidwood*, 606 U.S. at 774-75 (citation modified).  Again, the statute that creates the position of immigration judge states—without equivocation—that all immigration judges "shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe."  8 U.S.C. § 1101(b)(4).  A nearby provision confirms that the Attorney General may review any "administrative determination[] in immigration proceedings," including decisions issued by an immigration judge.  8 U.S.C. § 1103(g)(2); *see also A.A. v. Att'y Gen. of the U.S.*, 973 F.3d 171, 184 (3d Cir. 2020); *In re J.F.F.*, 23 I. & N. Dec. at 913 ("While Attorneys General have delegated their authority to the Board and Immigration Judges in the first instance, I retain the power to exercise full decisionmaking upon review.").

It thus does not matter when precisely the Board of Immigration Appeals gains jurisdiction over appeals from decisions of immigration judges, because the Attorney General has power to review and correct an immigration judge's decision.[9]  Regardless, Defendants are simply wrong

---

[9] By regulation, the Attorney General may refer matters from Board of Immigration Appeals to himself.  8 C.F.R. § 1003.1(h)(1)(i).  The government appears to be arguing that—where a matter has not reached the Board of Immigration Appeals—the Attorney General is powerless to

when they claim (Mot. 21) that the Board of Immigration Appeals can review immigration judges' decisions only in "limited circumstances." The regulations establish that just the opposite is true. 8 C.F.R. § 1003.1(b)(1)-(14); *id.* § 1003.10(c). And the few examples Defendants manage to muster up (Mot. 21 n.14) underscore the executive branch's control over immigration judges.[10] For example, Defendants argue (Mot. 21 n.14) that when a noncitizen "does not appeal" an immigration judge's removal decision, that decision is not reviewed by the Board. But in such a case, the immigration judge has ruled for the *government* by ordering removal, and thus is not acting against the executive branch's wishes. The same can be said of the other two examples Defendants cite, such as the fact that no appeal lies from certain decisions by immigration judges agreeing with an asylum officer that a noncitizen lacks a "credible fear of persecution or torture." 8 C.F.R. § 1208.30(g)(2)(iv). There is thus no Article II concern here.

In addition, contrary to Defendants' suggestion (Mot. 21 n.14), "in absentia" removal orders—orders that likewise side with the government—*are* subject to review by the Board. *See In re Guzman-Arguera*, 22 I. & N. Dec. 722, 723 (BIA 1999). As a procedural matter, the noncitizen first "file[s] a motion to reopen before the Immigration Judge," after which "he or she file[s] an appeal." *Id.* Finally, it bears repeating: Nothing precludes the Attorney General from conducting his own review of an immigration judge's decision, even absent an appeal to the Board

---

otherwise intervene and supervise an immigration judge. That is wrong and has no basis in the statute.

[10] In Defendants' lengthy footnote purporting to list decisions by immigration judges that are not subject to review by the Board of Immigration Appeals, Defendants highlight that immigration judges "have the authority to grant aliens a wide range of immigration benefits, including asylum." Mot. 21 n.14 (citing 8 C.F.R. § 1208.2(b)). Tellingly, however, Defendants do not argue that those decisions are unreviewable. *See, e.g.*, 8 C.F.R. § 1003.1(b)(9) (providing for review by the Board of Immigration Appeals over decisions in asylum proceedings under 8 C.F.R. § 1208.2(b) and (c)); 8 U.S.C. § 1103(g)(2).

of Immigration Appeals.  And if something did exist, the appropriate remedy is to invalidate the impediment to review, not eviscerate Title VII and the First Amendment.  *Arthrex*, 594 U.S. at 26-27.

Defendants also argue (Mot. 23) that Title VII and the First Amendment should not be construed to impose limits on the executive branch's removal authority, relying on case law specifying that Congress must use "very clear and explicit language" when it "takes away the power of at-will removal from an appointing officer."  *Braidwood*, 606 U.S. at 771 (citation modified).  But Defendants do not identify any ambiguity in Title VII's plain text, which expressly applies to all employees of federal agencies, including immigration judges.  *See* 42 U.S.C. § 2000e-16(a) (covering "[a]ll personnel actions affecting employees . . . in executive agencies as defined in [5 U.S.C. § 105]").  Indeed, no one—not even the government—has ever disputed that Title VII's plain language encompasses immigration judges.  *See, e.g.*, *Bain v. Office of Att'y Gen.*, 648 F. Supp. 3d 19, 43-57, 63-64 (D.D.C. 2022) (permitting some Title VII claims of immigration judge to proceed to discovery); *Rivera v. U.S. Att'y Gen.*, No. 23-cv-2113, 2025 WL 2676436, at *12-19 (M.D. Fla. Sep. 18, 2025) (denying the government summary judgment as to some Title VII claims asserted by immigration judge).  Meanwhile, the statutory-interpretation doctrine Defendants invoke has no applicability to Plaintiff's constitutional claim under the First Amendment.

Finally, Defendants assert (Mot. 21) that immigration judges make decisions "in an area of significant consequence" involving "this Nation's international relations."  This grossly overstates what immigration judges do.  The mine-run immigration proceeding involves the application of settled law to facts, subject to review by the Attorney General (and often the Board of Immigration Appeals).  As then-Acting EOIR Director Owen emphasized, immigration judges do not make

35

policy. *See supra* p. 24. Moreover, even Defendants do not seriously argue that Article II removal authority depends on whether an inferior officer in the executive branch exercises "core executive power." Mot. 21. Nor could they. After all, *Perkins* upheld removal restrictions for military officers, and *Morrison* upheld restrictions for a prosecutor. This Court should likewise uphold the protections invoked by Nemer.[11]

* * *

At bottom, Defendants ask the Court to overturn *Perkins* and its progeny. The Court should protect America's civil servants from abuse and deny the motion to dismiss.

## IV. NEMER APPROPRIATELY REQUESTED DECLARATORY RELIEF AND MANDAMUS.

Two housekeeping points on remedy. Defendants seek dismissal of the Complaint's declaratory judgment claim on the ground that Nemer "has not stated a claim for relief under another provision of law." Mot. 25. But that is wrong for all the reasons just described.

Nemer also requested "a writ of mandamus," "[*i*]*n the alternative*," should the Court find it cannot otherwise provide her injunctive relief on her First Amendment claim. Compl. ¶ 87 (emphasis added). In other cases, the government has argued that, because Anglo-American courts historically did not grant injunctions to removed officials, modern Article III courts lack authority

---

[11] If this Court were to disagree, it would need to reconcile the constitutional provisions at play in this case—the President's Article II removal authority, on the one hand, and Nemer's rights under the First Amendment, on the other hand. After all, even if Article II barred *statutory* restrictions on the President's authority to remove immigration judges, it does not follow that the President can violate their rights enshrined elsewhere in the *Constitution*. Here, the First Amendment right not to be inappropriately terminated based on political affiliation is wholly compatible with Article II and thus is entitled to equal respect. Regardless, as the Supreme Court has explained, recognizing First Amendment political-association claims by federal employees does not interfere with "the executive's responsibility to insure that the laws be faithfully executed" because "there can be no impairment of executive power . . . where actions pursuant to that power are impermissible under the Constitution." *Elrod*, 427 U.S. at 352 (dictum).

36

to grant any relief in this context.  To be clear: That argument misapprehends the scope of equitable relief.  Modern courts can and do issue injunctions to removed officials.  *See Severino v. Biden*, 71 F.4th 1038, 1043 (D.C. Cir. 2023).  But as Judge Contreras has explained in a scholarly opinion, "[t]o the extent that English equity courts declined to issue injunctions reinstating officials to their positions, they likely did so because the King's Bench, a court of law, would readily issue mandamus instead."  *Harris v. Bessent*, 775 F. Supp. 3d 164, 182 (D.D.C. 2025), *rev'd on other grounds*, 160 F.4th 1235 (D.C. Cir.), *petition for cert. filed*, No. 25-1110 (U.S. Mar. 17, 2026).  To forestall the government from arguing that Nemer cannot receive a remedy based on that English history, she also sought an alternative legal remedy in the form of mandamus.  *Id*. at 188 (finding that, if equitable relief is not available, the Court would "not hesitate" to provide mandamus).

Regardless, it is far too early to resolve the mandamus claim.  The Court can and should wait until it determines what other forms of relief are available.  *See, e.g.*, *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 200-01 (2024) (Lamberth, J.) (explaining that "[s]ome courts have held that dismissing an otherwise-well-pleaded mandamus claim due to the coexistence of a plausible APA claim is 'premature' at the motion to dismiss stage"); *Kirwa v. Dep't of Defense,* 285 F. Supp. 3d 257, 275-76 (D.D.C. 2018) (Huvelle, J.) ("[I]t would be premature to dismiss a cause of action on the ground that an adequate alternative remedy exists before determining the contours of that remedy and plaintiffs' entitlement to that remedy."); *Citizens for Resp. & Ethics in Wash. v. Exec. Off. of the President*, 587 F. Supp. 2d 48, 63 (D.D.C. 2008) (Kennedy, J.) (holding that the court may not "rule as a matter of law that plaintiffs will not be entitled to mandamus relief" at the motion-to-dismiss  stage); *Jud. Watch, Inc. v. Nat'l Energy Pol'y Dev. Grp.*, 219 F. Supp. 2d 20, 44 (D.D.C. 2002) (Sullivan, J.) (explaining that it would be "premature and

37

inappropriate" to dismiss a mandamus claim at the pleadings stage because plaintiffs successfully pleaded another claim to relief).

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss.

Dated: May 11, 2026       Respectfully submitted,

JAMES M. EISENMANN      /s/ Nathaniel A.G. Zelinsky
 (D.C. Bar No. 435456)     NATHANIEL A.G. ZELINSKY
KATHLEEN MCCLELLAN      (D.C. Bar No. 1724093)
 (D.C. Bar No. 993987)     SYDNEY FOSTER
ALDEN LAW GROUP, PLLC     (D.C. Bar No. 982340)
1850 M Street, NW, Suite 901    ROSA L. BAUM*
Washington, DC 20036      (D.C. Bar No. 90032839)
202-463-0300        WASHINGTON LITIGATION GROUP
jeisenmann@aldenlg.com     1717 K Street, NW, Suite 1120
kmcclellan@aldenlg.com     Washington, DC 20006
             202-521-8750
             nzelinksy@washingtonlitigationgroup.org
             sfoster@washingtonlitigationgroup.org
             rbaum@washingtonlitigationgroup.org

             *Application for admission pending*

     *Counsel for Plaintiff Tania Nemer*